IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LERATO NOMVUYO MZAMANE,           :      CIVIL ACTION
                                  :      NO. 08-4884
        Plaintiff,                :
                                  :
        v.                        :
                                  :
OPRAH WINFREY, et al.,            :
                                  :
        Defendants.               :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          March 15, 2010


TABLE OF CONTENTS

I.   INTRODUCTION...........................................2
II.  BACKGROUND.............................................3
     A.   Facts............................................3
          1.   Plaintiff's Background......................3
          2.   Winfrey's Background .......................4
          3.   Background of OWLAG.........................5
          4.   Plaintiff's Employment Relationship with OWLAG..6
          5.   Allegations of Abuse of OWLAG Students..........7
          6.   Winfrey's Response to the Events at OWLAG.......11
               i.   October 20, 2007 Meeting..................12
               ii.  November 5, 2007 Press Conference.........12
          7.   Aftermath of Winfrey's Comments ................13
     B.   Procedural History...............................14
III. DISCUSSION............................................15
     A.   Summary Judgment Standard........................15
     B.   Choice of Law Analysis...........................17
          1.   Pennsylvania versus Illinois................22
               i.   Defamation ...........................23
               ii.  False Light...........................31
               iii. Intentional Infliction of Emotional
                    Distress..............................31
          2.   Pennsylvania versus South Africa............32
               i.   Defamation............................32
               ii.  False Light...........................35
               iii. Intentional Infliction of
                    Emotional Distress....................36
          3.   Pennsylvania Law is Consistent with Due Process.36

        C.   Defamation Analysis.................................38
             1.   Pennsylvania Defamation Law....................39
             2.   Analysis under Pennsylvania Law................44
                  i.   Capable of Defamatory Meaning.............45
                  ii.  Of and Concerning Plaintiff...............46
                  iii. Specific Statements at Issue..............48
                       a.   October Meeting......................49
                            (1) Actionable statements............49
                            (2) Non-actionable statements........70
                       b.   November Press Conference............71
                            (1) Actionable statements............71
                            (2) Non-actionable statements........84
             3.   First Amendment Implications...................88
                  i.   Plaintiff's Status as a Public Figure.....89
                  ii.  Actual Malice............................107
        D.   False Light Analysis..............................120
        E.   Intentional Infliction of Emotional Distress
             Analysis..........................................123
IV.   CONCLUSION...............................................125

I.   INTRODUCTION

          Plaintiff Lerato Nomvuyo Mzamane ("Plaintiff") brings

this action for defamation, and related causes of action,

stemming from comments made by Oprah Winfrey ("Winfrey")

regarding Plaintiff's performance as headmistress of the Oprah

Winfrey Leadership Academy for Girls ("OWLAG").  Plaintiff claims

that she suffered significant damage to her professional

reputation as a result of Winfrey's comments.

          Before the Court is Defendants' motion for summary

judgment.  The Court concludes that, after a conflict of laws

analysis, Pennsylvania law applies to Plaintiff's substantive

claims.  The Court further concludes that under Pennsylvania law

certain of the statements made by Winfrey at a meeting with

parents of OWLAG students in October 2007 and at a news

conference in November 2007, are capable of defamatory meaning and "of and concerning" Plaintiff, that under First Amendment law Plaintiff is a limited public figure, but that if believed by the jury, Plaintiff has pointed to sufficient evidence in the record to satisfy the clear and convincing evidence standard for actual malice. Accordingly, Plaintiff's claims for defamation and false light will proceed to the jury, however, judgment will be entered in Defendants' favor as to Plaintiff's claims for intentional infliction of emotional distress.

II.  BACKGROUND

    A.   <u>Facts</u>

        1.  Plaintiff's Background

        Plaintiff was born in Teyateyaneng, Lesotho[1] in 1969 and in 1990 graduated from the University of Jos in Nigeria with a bachelor's degree in special education. (Am. Compl. ¶¶ 9-10.) In 1992, she obtained a Master's Degree from St. Michael's College in Colchester, Vermont, during which time she earned her MEd in Curriculum Development and Instruction as well as her K-6 Teaching License. (<u>Id.</u> ¶ 10.) From 1992 to 1995, Plaintiff taught the fourth grade class at Beverly J. Martin Elementary School in Ithaca, New York. (<u>Id.</u> ¶ 13.) Plaintiff was accepted into Cornell University's doctoral program in education in 1995.

---

        [1]    Lesotho is a country located in the southern portion of Africa.

(Id. ¶ 14.)   Plaintiff studied Educational Administration,
however, she ultimately did not earn a PhD. (Lerato Nomvuyo
Mzamane Dep. 385:5-12, Aug. 24, 2009.)

From 2000 through 2004, Plaintiff worked as Vice
Principal, Dean of Faculty and Academic Dean at Germantown
Friends Lower School in Philadelphia ("Germantown"), and was
promoted to Assistant Head of School for Operations for
Germantown in 2004.   (Am. Compl. ¶¶ 16-17.)   Plaintiff continued
her employment at Germantown until December 2006, at which time
she accepted a position as a Consultant for Learner Education and
Development at OWLAG. (Id. ¶ 18.)

2.   Winfrey's Background

Winfrey is the founder of co-defendants Harpo
Productions, Inc. and Harpo, Inc. (collectively, "Harpo").   She
is the creator and host of The Oprah Winfrey Show, which is a
syndicated television program that is produced by Harpo and
appears on local television stations throughout the United States
and the world.   The Oprah Winfrey Show has been rated the number
one television show in American television for twenty-four
seasons.   (Oprah Winfrey Dep., 18:12-14, Oct. 6, 2009.)   Winfrey
is involved intimately in running the operations of Harpo, which
focuses on media and communications, including television, radio,
and a magazine.   (Id. at 15:17-22.)   In 2009, Winfrey was named
by Time Magazine as one of the 100 most influential people in the

world.  See The Time 100: The World's Most Influential People, Time Magazine, May 11, 2009.

3.   Background of OWLAG

OWLAG is a private academy opened by Winfrey in South Africa, and run by the Oprah Winfrey Leadership Academy Foundation (the "Foundation").  OWLAG provides education for children from impoverished families.  (Winfrey Dep. 12:3-13:6.) OWLAG began as a partnership between the Foundation and the government of South Africa.  (Id. 18:23-19:3.)  OWLAG has 28 buildings on a 52-acre campus in a small town called Henley-on-Klip near Johannesburg, South Africa.  The annual operating costs for OWLAG are approximately $10,000,000.  These costs are funded by the Foundation.  Winfrey herself was involved with multiple aspects of the planning at OWLAG, such as the architecture and construction of the school.  (Id. 14:13-15.)

At OWLAG, students live in dormitories on the school's campus and are supervised by employees present in the dorms (the "Dorm Parents") at the conclusion of the students' academic day. At the time OWLAG opened it did not have Dorm Parents in place. (Id. 37:7-17.)  Winfrey herself was not involved with the hiring of the Dorm Parents.  (Id. 37:10-17.)

The school opened on January 2, 2007, with an approximate enrollment of 150 seventh and eighth grade female students.  (J. Samuel Decl. ¶ 2.)  The opening of OWLAG attracted

media attention, including coverage by the Philadelphia Inquirer and CNN.  (See Defs.' Mot. Summ. J. Ex. C.)

        4.   Plaintiff's Employment Relationship with OWLAG

        According to Plaintiff, at the time she accepted the consultancy position at OWLAG in December 2006, her understanding was that she would be mentored by the Interim Head of Academy, Joan Countryman, and would ascend to the position of the Head of Academy at some point in 2008.  (Am. Compl. ¶¶ 22-23.)  Plaintiff entered into her employment agreement for the consultancy position on December 28, 2006, however, within several days of her arrival in South Africa, she was appointed to the position of the Head of Academy ("Headmistress") in place of Ms. Countryman. (Id. ¶ 23.)  Plaintiff entered into a written employment contract with the Foundation, which provided a fixed term of employment from January 11, 2007 to December 31, 2007.  (Defs.' Mot. Summ. J. Ex. D.)

        As Headmistress, Plaintiff's "charge was to be responsible for the girls and the curriculum and the residential life of the girls at the school."  (Winfrey Dep. 49:9-11.) Plaintiff was responsible, along with another OWLAG employee (Sonya Anderson), for hiring the Dorm Parents.  Plaintiff's duties did not include media or public relations obligations related to the administration of OWLAG.

        Plaintiff asserts that throughout her tenure as

Headmistress she was in constant contact with Winfrey, as well as representatives of Harpo and members of the Foundation. Plaintiff contends that the substance of these communications included general administration of OWLAG, planning for OWLAG events, the progress of individual OWLAG students, and interactions with parents of OWLAG students.  (Am. Compl. ¶ 24.)

As Headmistress, Plaintiff was also responsible for dealing with complaints from OWLAG students, specifically complaints about their interaction with the Dorm Parents. Plaintiff contends that she would often hear grievances from students about their treatment by Dorm Parents.  After considering the merits of the complaints, Plaintiff would often instruct the respective Dorm Parent to apologize to the students and discuss the substance of the complaints with the students. (Mzamane Dep. 32:7-15.)

5.   Allegations of Abuse of OWLAG Students

At some point during the period of April - June 2007, Plaintiff received a letter from several OWLAG students complaining of the treatment by one of the Dorm Parents, Tiny Makopo ("Makopo").[2]  (Id. 32:2-4.)  Plaintiff claims that she confronted Makopo with the letter and instructed her to apologize to the students under her supervision.  (Id. 32:5-24.)  No media

---

[2]     Neither party claims that any allegations of physical or sexual abuse were contained in the letter complaining about Makopo's mistreatment.

coverage ensued at the time this event occurred.

On September 27, 2007, the South African Newspaper Sowetan published an article (the "Sowetan Article") which reported on the departure of a student, Aviwe Mncwabe ("Mncwabe"), from OWLAG.  (Am. Compl. Ex. B.)  The Sowetan Article stated that Mncwabe characterized her experience at OWLAG as a "nightmare" and quoted Mncwabe's mother as saying that her daughter "suffered emotional abuse" while attending the school. (Id.)  The Sowetan Article also recounted statements by Mncwabe's mother claiming that she complained to the administrators at OWLAG concerning abusive treatment by an unidentified Dorm Parent.  (Id.)  Mncwabe's mother was quoted in the Sowetan Article to say: "I spoke to the principal and she promised to look into the problem but never did.  When I confronted her about it, it became clear to me that she was supporting her staff and I had no choice but to pull her out of the school."  (Id.)[3]

Plaintiff acknowledges that prior to publication of the

---

[3]     Subsequent to the publication of the Sowetan Article, Mncwabe's father, Milton Mncwabe, was quoted in two articles published in South African newspapers on November 17, 2007, and December 1, 2007, respectively.  In the article printed in the Pretoria News on November 17, 2007, Mncwabe's father characterized Plaintiff as a "liar" and stated that he had complained to Plaintiff about abuse by certain Dorm Parents, but that Plaintiff took no action in response.  (Defs.' Mot. Summ. J. Ex. C.)  On December 1, 2007, The Star, another South African Newspaper, printed an article quoting Mncwabe's father as saying that he went directly to Plaintiff's office with Mncwabe to complain of the abusive treatment, but that Plaintiff failed to take any action in response.  (Id.)

Sowetan Article, Mncwabe had complained of being homesick and wanting to leave OWLAG, and that a teleconference was held on September 13, 2007, with Mncwabe's parents concerning the student's desire to leave OWLAG.  Plaintiff contends that she did have a conversation with Mncwabe's mother concerning complaints about treatment by a particular Dorm Parent (Nomvula Zulu), but that none of the complaints discussed involved physical or sexual abuse by a Dorm Parent.  (See Mzamane Dep. 163-64.)

In September 2007, another OWLAG student, identified for purposes of confidentiality only as "B.L.," met with Plaintiff and expressed concerns about the treatment she was receiving from Dorm Parent Makopo.[4]  Plaintiff recognized that B.L. was having difficultly expressing her problems to Plaintiff, and therefore, Plaintiff encouraged B.L. to speak with the school's psychologist and/or social worker.  Plaintiff contends that B.L. never suggested to her that Makopo had subjected B.L. to any type of physical or sexual abuse during this meeting.

On October 1, 2007, Plaintiff left South Africa for the United States to participate in various meetings related to the administration of OWLAG, including a meeting with Winfrey to discuss applicants for the incoming classes at OWLAG.  During Plaintiff's absence, complaints began to surface from students

---

[4]    During this meeting, B.L. was accompanied by another Dorm Parent.

- 9 -

regarding abusive treatment by Dorm Parent Makopo.

On October 1, 2007, one of the OWLAG staff members, Ifunaya "Funa" Maduka met with a group of seven students who complained of abusive treatment by Makopo and stated that they witnessed Makopo sleeping in the same bed with an OWLAG student. (I. Maduka Decl. ¶ 2.)  This information was relayed to John Samuel ("Samuel"), Chief Executive Officer of OWLAG.  Samuel held a meeting with approximately fifteen students on October 3, 2007, during which the students expressed concerns of unfair treatment by the Dorm Parents.  (J. Samuel Decl. ¶ 7.)  After receiving this information, Samuel spoke with the school psychologist, Lerato Mabenge, who stated that she was aware of certain evidence indicating acts of sexual abuse by Dorm Parent Makopo.  (Id. ¶ 8.)[5]

On October 6, 2007, Samuel alerted Winfrey to the allegations of abuse, and they agreed that the authorities should be informed.  (Id. ¶ 9.)[6]  Samuel contacted the South African authorities concerning the allegations of abuse on October 8,

---

[5]    After these allegations surfaced, Makopo was summarily dismissed from her position as a Dorm Parent.

[6]    Winfrey also arranged for the alleged abuse to be investigated by a team of professionals, consisting of law enforcement and medical specialists in the field of child trauma. (O. Winfrey Decl. ¶ 2.)

2007.  (Id.)[7]  Following a criminal investigation by the South
African police, Makopo was arrested and charged with child abuse.

      6.   Winfrey's Response to the Events at OWLAG

     On October 8, 2007, Plaintiff attended a meeting with
Winfrey in Chicago.  This meeting was originally scheduled to
allow Winfrey and Plaintiff to discuss applicants for the
incoming classes of students at OWLAG.  During this October 8,
2007 meeting, Winfrey informed Plaintiff that she would be placed
on administrative leave with pay pending an internal
investigation of the alleged misconduct at OWLAG.  (Mzamane Dep.
14:10-12.)  The parties dispute whether Plaintiff was allowed an
"opportunity to talk at that meeting."  (See id. 57:17-58:22.)
Plaintiff subsequently was informed that her employment contract
would not be renewed upon its expiration on December 31, 2007.

     On October 17, 2007, Samuel released a public statement
on behalf of OWLAG which stated that OWLAG was conducting an
internal investigation into the allegations of abuse.  (Defs.'
Mot. Summ. J. Ex. C-15.)  This public statement specifically
declared the following with respect to Plaintiff's involvement in
the internal investigation: "[i]n order to ensure an impartial
investigation, the Head of Academy and the Academy Administration
mutually agreed she would take a paid leave of absence.  The Head

---

    [7]   Also on October 8, 2007, Samuel interviewed another
student who stated that Makopo had attacked her in her room and
choked her.  (Id. ¶ 10.)

of Academy is not the subject of the allegation of misconduct."
(Id.)  Winfrey released a personal statement in conjunction with
OWLAG's public statement which provided: "[n]othing is more
serious or devastating to me than an allegation of misconduct by
an adult against any girl at the academy.  I will do everything
in my power to ensure their safety and well-being."  (Id.)

   The release of this public statement, along with the
dismissal of Makopo from OWLAG, generated significant attention
from the international media.  (L. Halliday Decl. ¶ 11.)

       i. October 20, 2007 Meeting

   On October 20, 2007, a meeting was held in South Africa
between Winfrey and the parents of OWLAG students in order to
discuss the abuse allegations and corresponding internal
investigation (the "October Meeting").  The October Meeting was a
private meeting between Winfrey and the students' parents
regarding the mistreatment of the students by the Dorm Parents.[8]
Plaintiff contends that several statements, set forth in detail
below, made at the October Meeting address Plaintiff's knowledge
and/or involvement in the misconduct and form the basis for her
defamation claim.

      ii. November 5, 2007 Press Conference

---

   [8]  The parties dispute whether the statements made at the
October Meeting remained confidential or were subsequently leaked
to the media.  For purposes of this Memorandum, the parties agree
that Winfrey's statements at the October Meeting were "published"
for purposes of establishing liability for a defamation claim.

Winfrey held a press conference on November 5, 2007
(the "November Press Conference").  The November Press Conference
was structured as a teleconference in which reporters located in
South Africa asked questions to Winfrey, who was located in
Chicago.  The November Press Conference was available
electronically at Harpo's website until May 2009.  Plaintiff
asserts that several statements made by Winfrey, set forth in
detail below, during the November Press Conference were
defamatory.

     7.   Aftermath of Winfrey's Comments

Significant media coverage of the controversy at OWLAG
ensued following the November Press Conference.  In Plaintiff's
view, the media coverage portrayed her in a negative light with
respect to her supposed role in the physical and sexual abuse by
the Dorm Parents uncovered at OWLAG.  On November 8, 2007,
Plaintiff issued a press statement which stated that she had no
knowledge of the alleged abuse and did not take any action to
cover-up such abuse (the "Press Release").  The Press Release, in
its entirety, states:

> I was greatly shocked and deeply saddened when I
> recently heard of the allegations of abuse at the
> Academy.  My prayers and heart go out to the children and
> families experiencing the trauma, and to the entire
> school community.
> Unfortunately, in the understandable and shared
> shock, the response to this terrible crisis has involved
> false allegations made about me.  Contrary to reports, I
> had no knowledge of this abuse. I did not and would never
> participate in any such cover up. As the head of academy,

my track record has been of one who acted decisively and
in the best interests of the child where there was even
a hint of inappropriate speech or action on campus.

With two decades of experience across the African
continent and the United States working with children and
schools, and drawing on the lessons of parenthood, I did
everything I could to build an open school community
where the child's voice was honored and where youthful
frivolity lived side by side with an intense focus on
academics.  I have always been and will always be a
passionate advocate for children and their families, and
a South African patriot devoted to participating in the
important work of nation-building through education.

I care deeply for the students at the Academy and
their families.  As I have told these marvelous young
ladies many times, they are some of the most phenomenal
people who have ever graced this earth.

(Defs.' Mot. Summ. J. Ex. D-19.)

Plaintiff alleges that as a result of the highly
publicized statements by Winfrey regarding the alleged abuse, she
was precluded from finding employment in the educational field
until August 2008, at which time she obtained a temporary
consultancy position with Bridge International Academy in South
Africa.  (Mzamane Dep. 8:8-12.)  As of November 2008, Plaintiff's
position at Bridge International Academy became permanent.  (Id.)

B.   Procedural History

On October 3, 2008, Plaintiff filed a complaint in the
Court of Common Pleas of Philadelphia County.  On October 10,
2008, Defendants removed the action to this Court based upon
diversity of citizenship.  Plaintiff filed an amended complaint
on February 2, 2009, in which she alleged claims for defamation,
false light, and intentional infliction of emotional distress.

Defendants filed a motion for summary judgment and a hearing was
held before this Court on December 16, 2009.  After permitting
supplemental briefing by the parties as to certain issues,
Defendants' motion for summary judgment is now ripe for
adjudication.


III. DISCUSSION

        Plaintiff's claims for defamation, false light, and
intentional infliction of emotional distress are based on a
series of allegedly defamatory statements made by Winfrey at the
October Meeting and the November Press Conference.  The Court
will address each claim in turn.

    A.    <u>Summary Judgment Standard</u>

        Pursuant to Federal Rule of Civil Procedure 56(c), a
motion for summary judgment will be granted, drawing all
inferences in favor of the nonmoving party, where "the pleadings,
the discovery and disclosure materials on file, and any
affidavits show that there is no genuine issue as to any material
fact and that the movant is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(c); <u>accord</u> <u>Saldana v. Kmart Corp.</u>, 260
F.3d 228, 231-32 (3d Cir. 2001).  The "mere existence" of
disputed facts is insufficient to defeat a motion for summary
judgment, rather a showing of a genuine issue regarding a
<u>material</u> fact is required.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 247-48 (1986) (emphasis added).  A factual dispute is deemed to be "material" where its resolution might affect the outcome of the case pursuant to the applicable law.  Id. at 248 ("As to materiality, the substantive law will identify which facts are material.").

In order to find that a "genuine" dispute exists, there must be a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict in favor of the non-moving party.  Id. at 248; see Pignataro v. Port Auth. of N.Y. and N.J., 593 F.3d 265, 268 (3d Cir. 2010).  All inferences must be drawn in the light most favorable to the nonmoving party.  Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare, 402 F.3d 374, 379 (3d Cir. 2005) ("We are required to review the record and draw inferences in a light most favorable to the nonmoving party . . . yet the nonmoving party must provide admissible evidence containing 'specific facts showing that there is a genuine issue for trial.'") (quoting Fed. R. Civ. P. 56(e)).

It is inappropriate at the summary judgment stage for a court to resolve factual disputes or make credibility determinations, however, a court is not required "to turn a blind eye to the weight of the evidence."  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (noting that the party opposing summary judgment "must do

more than simply show that there is some metaphysical doubt as to the material facts") (internal citation omitted).  Summary judgment is appropriate where the non-moving party only presents evidence that is "colorable" or "not significantly probative." Anderson, 477 U.S. at 249-50; see Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993) (recognizing that the non-moving party must provide more than a "mere scintilla" of evidence, but is not required to match each item of evidence relied upon by the moving party).

Upon a showing by the moving party that the claims of the non-moving party cannot be supported by the available evidence, the non-moving party must go beyond the allegations contained in the complaint and through the use of its "own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (internal quotations omitted).  "Such affirmative evidence - regardless of whether it is direct or circumstantial - must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." Saldana, 260 F.3d at 232 (quoting Williams v. Borough of W. Chester, 891 F.2d 458, 460-61 (3d Cir. 1989)).

B.    Choice of Law Analysis

It is beyond cavil that the conflict of laws rules of

the forum state apply when a federal court exercises diversity jurisdiction.  Kaneff v. Del. Title Loans, Inc., 587 F.3d 616, 621 (3d Cir. 2009) (internal citations omitted).  Therefore, as this Court sits in Pennsylvania, it will apply Pennsylvania's choice of law rules.

Pennsylvania employs a two-step hybrid framework to choice of law questions.  See Atl. Pier Assocs., LLC v. Boardakan Rest. Partners, 647 F. Supp. 2d 474, 486-87 (E.D. Pa. 2009) (discussing Pennsylvania's approach to conflict of laws issue) (internal citation omitted).  Under the first step of this analysis, the Court must determine whether a real conflict exists between the respective laws.  Hammersmith v. TIG Ins. Co., 480 F.3d 220, 230 (3d Cir. 2007).  A real conflict exists only where the application of each state's substantive law produces a contrary result.  Id.  If the same result would ensue under the laws of the forum state and those of the foreign jurisdiction, then no conflict exists, and the court may avoid the choice of law question altogether.  Id.; see Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006) (finding that where applying the laws of both jurisdictions would produce an identical result, a court should not engage in a choice of law analysis) (citing Williams v. Stone, 109 F.3d 890, 893 (3d Cir. 1997)).

Where a conflict exists, a court must proceed to the

second step of the conflict inquiry to determine whether the conflict is "true," "false," or "unprovided for." Hammersmith, 480 F.3d at 230. A "true" conflict exists where both states have a cognizable interest in applying their own law. Id. A "false" conflict exists when only one state has an actual interest in applying its law. Id. The situation is "unprovided for" when neither state has an interest in applying its own law. Id. at n.9. Where a false conflict or "unprovided for" situation exists, the Court's inquiry is at an end and the law of the forum applies. It is only necessary to proceed to a "deeper" choice of law analysis where a true conflict exists, i.e., the interests of both of the respective states would be impaired by application of the other's law. Id. at 230 (citing Cipolla v. Shaposka, 267 A.2d 854, 856 (Pa. 1970) (emphasis in original)).

Upon finding that a true conflict exists, the Court must then determine "which state has the greater interest in the application of its law." Id. at 231. This analysis consists of combining "the approaches of both [the] Restatement II (contacts establishing significant relationships) and 'interest analysis' (qualitative appraisal of the relevant States' policies with respect to the controversy).'" Id. (citing Melville v. Am. Home Assurance Co., 584 F.2d 1306, 1311 (3d Cir. 1978)). In the end, a court does not merely count the number of contacts between the forums and compare; rather the court must "weigh the contacts on

a qualitative scale according to their relation to the policies

and interests underlying the [particular] issue." Id. (citing

Shields v. Consol. Rail Corp., 810 F.2d 397, 400 (3d Cir. 1987)).

Turning to the choice of law question before the Court,

there are three potential forums whose law could control the

instant dispute: South Africa, Pennsylvania, and Illinois.[9]  As

the law of South Africa implicates considerations of

international law unique to a separate sovereign, Federal Rule of

Civil Procedure 44.1 must be addressed before proceeding to the

conflict analysis.

Rule 44.1 controls the application of foreign law in

federal court.  It provides:

> A party who intends to raise an issue about a foreign
> country's law must give notice by a pleading or other
> writing.  In determining foreign law, the court may
> consider any relevant material or source, including
> testimony, whether or not submitted by a party or
> admissible under the Federal Rules of Evidence. The
> court's determination must be treated as a ruling on a
> question of law.

Fed. R. Civ. P. 44.1.  While this rule empowers a district court

with the authority to determine applicable foreign law, it

imposes no obligation on the court to inquire into foreign law

---

[9]      In short, South African law potentially applies because
the allegedly defamatory communications were published in South
Africa.  Illinois law potentially applies because several of the
allegedly defamatory statements emanated from Illinois and all
Defendants are citizens of Illinois.  Pennsylvania law
potentially applies because Plaintiff was domiciled in
Pennsylvania and allegedly suffered harm to her reputation in
Pennsylvania.

sua sponte.  See Bel-Ray Co., Inc. v. Chemrite Ltd., 181 F.3d
435, 440 (3d Cir. 1999) (stating that Rule 44.1 "provides courts
with broad authority to conduct their own independent research to
determine foreign law but imposes no duty upon them to do so");
Integral Res. Ltd. v. Istil Group, Inc., 155 F. App'x 69, 73 (3d
Cir. 2005) (non-precedential opinion) (finding that the district
court was not required to consider the law of Pakistan sua
sponte).

        Under Rule 44.1, it is incumbent upon the parties to
"carry both the burden of raising the issue that foreign law may
apply in an action, and the burden of adequately proving foreign
law to enable the court to apply it in a particular case."  Bel-
Ray, 181 F.3d at 440 (citing Whirlpool Fin. Corp. v. Sevaux, 96
F.3d 216, 221 (7th Cir. 1996)).  Therefore, where the parties do
not satisfy both of these burdens, the law of the forum will
apply.  See id. at 441 (finding that where a litigant failed to
raise the issue of whether South African contract law applied and
failed to provide any evidence as to the substance of that
foreign law, it was appropriate to apply the law of the forum);
Walter v. Neth. Mead N.V., 514 F.2d 1130, 1137 n.14 (3d Cir.
1975) (concluding that although the law of the Netherlands
ostensibly applied, where a party did not conclusively establish
the foreign law, the court should assume it is consistent with
the law of the forum).

Here, initially, neither party raised the issue of the applicability of South African law to Plaintiff's claims. Rather, both parties argued vigorously against application of South African law to the instant dispute.  The Court, however, raised the issue to the parties at the hearing on summary judgment and ordered additional briefing on the topic.  The Court will accept these submissions as adequate in order to address the conflict of laws issue.[10]   Thus, the Court proceeds to apply Pennsylvania's conflict of laws framework, which requires examination of the applicable law of the three forums.[11]

    1.   Pennsylvania versus Illinois

As a preliminary matter, the Court rejects Defendants' argument that Illinois law controls due to the choice of law provision contained in Plaintiff's employment contract with the Foundation for two reasons.[12]   One, the employment contract at

---

[10]   Although it is questionable whether either party has satisfied the burden of conclusively establishing the contours of South African defamation law, as discussed in more detail below, the parties failed to address the issue of the applicability of South African law with respect to Plaintiff's claims for false light invasion of privacy and intentional infliction of emotional distress.  Rather, the parties limited their briefing to a conflict analysis of South African law as to defamation only.

[11]   Technically the Court is required to compare the law of the three forums concurrently in resolving the choice of law issue.  For purposes of clarity, however, the Court will first perform a conflict analysis for Pennsylvania and Illinois law, and then repeat this analysis with respect to South African law.

[12]   The text of the relevant provision provides that "[t]his Agreement and all matters or issues collateral thereto

- 22 -

issue was between the Foundation and Plaintiff, and neither
Winfrey nor any other Defendant is a signatory to that agreement.
Two, and more importantly, the tort claims alleged do not depend
upon the existence of the employment agreement.  In other words,
these claims are not intertwined with the performance of the
employment agreement itself, rather the claims rely upon extra-
contractual events beyond the scope of the forum selection
provision.  See Coram Healthcare Corp. v. Aetna U.S. Healthcare,
Inc., 94 F. Supp. 2d 589, 592 (E.D. Pa. 1999) (finding that fraud
and negligent misrepresentation claims were not covered by
contractual choice of law provision); Nubenco Enters., Inc. v.
Inversiones Barberena, S.A., 963 F. Supp. 353, 373 (D.N.J. 1997)
(defamation and misappropriation claims not covered by forum
selection clause); Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa.,
Inc., 848 F. Supp. 569, 576 (E.D. Pa. 1994); Brown v. SAP Am.,
No. 98-507, 1999 WL 803888, at *5 (D. Del. Sept. 13, 1999).

       i.    Defamation

      With respect to the first step of the conflict of laws
analysis, the Court finds that an actual conflict exists between
the law of defamation in Pennsylvania and Illinois in light of
the existence of the "innocent construction rule" recognized
under Illinois law.  The "innocent construction rule" provides

shall be governed by the laws of the State of Illinois."  (Defs.'
Mot. Summ. J. Ex. D-15, ¶ 9.9.)

that "even if a statement falls into one of the categories of
words that are defamatory <u>per se</u>, it will not be actionable <u>per
se</u> if it is reasonably capable of an innocent construction."
<u>Tuite v. Corbitt</u>, 866 N.E.2d 114, 121 (Ill. 2006); <u>see also</u>
<u>Chapski v. Copley Press</u>, 442 N.E.2d 195, 196-97 (Ill. 1982).
"Stated differently, 'a statement reasonably capable of a
nondefamatory interpretation, given its verbal or literary
context, should be so interpreted.  There is no balancing of
reasonable constructions . . . .'"  <u>Green v. Rogers</u>, 917 N.E.2d
450, 463 (Ill. 2009) (internal quotation marks and citation
omitted).

         In contrast, under Pennsylvania law, no such innocent
construction rule exists.  See <u>Dougherty v. Boyertown Times</u>, 547
A.2d 778, 783 (Pa. Super. Ct. 1988) (noting that a statement
capable of innocent meaning should be viewed as a jury question)
(internal citation omitted); <u>Gordon v. Lancaster Osteopathic
Hosp. Ass'n, Inc.</u>, 489 A.2d 1364, 1368 (Pa. Super. Ct. 1985)
("Even where a plausible innocent interpretation of the
communication exists, if there is an alternative defamatory
interpretation, the issue must proceed to the jury.").
Therefore, so long as the statement is capable of defamatory
meaning, whether it was actually defamatory is a jury question.
See <u>Brophy v. Phila. Newspapers, Inc.</u>, 422 A.2d 625, 628 (Pa.
Super. Ct. 1980) (holding that the case must proceed past summary

judgment if the statement is capable of defamatory
interpretation).

   The Court further concludes that this difference
represents an "actual" conflict in that both Illinois and
Pennsylvania have an interest in applying their respective laws.
Illinois adopted the "innocent construction rule" in order to
afford a certain degree of protection for its speakers in areas
of potentially defamatory communications.  <u>See</u> <u>Tuite</u>, 866 N.E.2d
at 503 (noting that the justification for the innocent
construction rule springs from an interest in guarding the free
speech of the speaker).  Pennsylvania, on the other hand,
maintains an interest in safeguarding a person's reputation from
unjust harm.  <u>See</u> <u>Am. Future Sys., Inc. v. Better Bus. Bureau of</u>
<u>E. Pa.</u>, 923 A.2d 389, 395 (Pa. 2007) (stating that "reputational
interests occupy an elevated position within our state
Constitution's system of safeguards").

   Due to the existence of this actual conflict, the Court
must determine which state has a materially greater interest in
application of its law.  This requires an examination of the
relevant contacts of the respective forums and how those contacts
relate to the States' policies underlying the applicable laws.
The Court looks to the Restatement (Second) of Conflicts for
guidance in resolving this issue.

   Defendants contend that Illinois has a greater interest

in having its law apply because all Defendants are citizens of Illinois and the allegedly defamatory statements made during the November Press Conference were made by Winfrey in Chicago, and that these contacts are in keeping with Illinois' asserted interest in protecting the free speech rights of its speakers. In contrast, Plaintiff posits that Pennsylvania law should apply because Plaintiff was domiciled in Pennsylvania at the time of the defamatory communications and had a bona fide interest in her reputation in Pennsylvania, and that these contacts are consistent with Pennsylvania's interest in affording the highest protection to the reputational interest of its citizens.

An individual's interest in her reputation has been described as a "valuable asset in one's business or profession." Fitzpatrick v. Milky Way Prods., Inc., 537 F. Supp. 165, 171 (E.D. Pa. 1982).  The purpose underlying defamation law is to compensate an individual for pecuniary harm to one's reputation inflicted by a defamatory statement.  See Wilson v. Slatalla, 970 F. Supp. 405, 414 (E.D. Pa. 1997).  Therefore, the majority of courts confronted with this choice of law question have found that the plaintiff's domicile should control since this is the forum with the greater interest.  See Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072 (3d Cir. 1985) (district court correctly applied Pennsylvania law because the plaintiff was a Pennsylvania resident and any harm to his reputation that may

have occurred centered in that state); <u>Franklin Prescriptions, Inc. v. The New York Times Co.</u>, 267 F. Supp. 2d 425, 432 (E.D. Pa. 2003) (finding that because plaintiff's principal place of business, and by extension its reputational interest and business contacts, was in Pennsylvania, it was the forum with the most significant relationship to the defamation action); <u>Wilson</u>, 970 F. Supp. at 414 (holding that "the state of plaintiff's domicile generally has the greatest concern in vindicating plaintiff's good name and providing compensation for harm caused by defamatory publication"); <u>Kraus Indus., Inc. v. Moore</u>, No. 06-00542, 2007 WL 2744194, at *4 (W.D. Pa. Sept. 18, 2007); <u>Keeshan v. Home Depot, U.S.A., Inc.</u>, No. 00-529, 2001 WL 310601, at *14 (E.D. Pa. Mar. 27, 2001) (applying Pennsylvania law to defamation claim because plaintiff was a Pennsylvania resident and the defamatory remark was published in Pennsylvania); <u>Osby v. A & E Television Networks and Kurtis Prods., Ltd.</u>, No. 96-7347, 1997 WL 338855, at *3 (E.D. Pa. Jan. 17, 1997) (citing Restatement (Second) of Conflict of Laws § 150(2)).

        This approach is consistent with the Restatement. Under § 150(2) of the Restatement (Second) of Conflicts, "[w]hen a natural person claims that he has been defamed by an aggregate communication, the state of the most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state."

- 27 -

Restatement (Second) of Conflicts of Law § 150(2).

The parties dispute whether statements from the October Meeting were re-published outside of South Africa.  Defendants concede, however, that the statements from the November Press Conference were available on the internet, and therefore, were published throughout the United States, including Pennsylvania. Thus, if Plaintiff is found to have been domiciled in Pennsylvania during the operative time period, then the Restatement militates in favor of applying Pennsylvania law.

The Court finds that Plaintiff was domiciled in Pennsylvania at the time the allegedly defamatory communications were published.  Plaintiff lived in Pennsylvania from 2000 through 2006 while working at Germantown.  The Restatement provides that a person's domicil is usually a person's home.  Id. § 11.  The Restatement further defines one's home as "the place where a person dwells and which is the center of his domestic, social and civic life."  Id. § 12.  Moreover, the Restatement provides that in order "[t]o acquire a domicil of choice in a place, a person must intend to make that place his home for the time at least."  Id. § 18.  The evidence presented indicates that during Plaintiff's time working at Germantown she treated Pennsylvania as her home (as defined by the Restatement) and intended to remain in Pennsylvania until the opportunity at OWLAG materialized in 2006.  Moreover, as of October 8, 2007, when

Plaintiff was placed on administrative leave, she remained in the
United States and resumed living in Pennsylvania prior to the
time that the October Meeting and the November Press Conference
occurred.[13]

Furthermore, the fact that Plaintiff maintained a
residence in South Africa while working at OWLAG does not
undermine the conclusion that Plaintiff's domicile is
Pennsylvania.  According to the Restatement, a person has no more
than one domicil at a time, id. § 11, and a person retains the
same domicil until it is superseded by a new domicil.  Id. § 19.
While Plaintiff's employment agreement with OWLAG provided that
she would maintain a residence on the OWLAG campus during the
school year, the agreement clearly contemplates that Plaintiff
would remain domiciled in Pennsylvania and would travel to OWLAG
in connection with her position as Headmistress.  For instance,
the employment agreement provides that Plaintiff would receive
paid accommodations for air travel "for four (4) trips per year

---

[13]     Defendants emphasize that beginning on October 9, 2007,
Plaintiff stayed in Baltimore, Maryland for approximately 1 to 2
weeks, and then traveled throughout the United States to visit
colleges with her daughter.  (Mzamane Dep. 23:8-24:21.)
Defendants posit that Plaintiff's connection to Pennsylvania is
lessened by the fact that she was not physically located there at
the time the allegedly defamatory communications were made.
Plaintiff's physical presence on the exact dates that the
statements were made is of no moment to the Court's analysis as
the Plaintiff's temporarily traveling outside of Pennsylvania
does not dictate that she revoked her domicile there.  See id. §
19.

to South Africa, one trip per calendar per quarter." (Defs.'
Mot. Summ. J. Ex. D-15, ¶ 3.4.)  Furthermore, the employment
agreement provides that "[t]he Head of Academy will be based in
Philadelphia, Pennsylvania with extensive travel anticipated to
the Academy's location at Henley on Klip, South Afica."  (Id. ¶
4.1.)  Thus, it is clear that by accepting the position at OWLAG,
Plaintiff was in no sense renouncing her domicile in
Pennsylvania.

        Defendants argue that Plaintiff was not domiciled in
Pennsylvania because domicil requires an intent to permanently
reside in a particular forum, and since Plaintiff traveled to the
United States on a visa, her domicil never changed from Kenya,
her country of origin.  This argument is not persuasive.  It is
true that courts have recognized that a visa prevents an
immigrant from establishing a legal domicil in the United States
under certain circumstances.  See Graham v. I.N.S., 998 F.2d 194,
196 (3d. Cir. 1993) (finding that an alien could not establish
domicil for purposes of a deportation statute because the legal
definition of the term "domicil" necessitates an intent to remain
in a forum indefinitely, which conflicted with a temporary worker
visa's requirement that the holder have a foreign residence that
he does not intend to abandon).  As explained above, however,
domicil for purposes of conducting a choice of law analysis under
the Restatement requires only that an individual intend to reside

in a particular forum for the foreseeable future.  <u>See</u>
Restatement 2d. § 18.

The Court concludes that because Plaintiff was
domiciled in Pennsylvania at the time the allegedly defamatory
statements were published, Pennsylvania has a greater interest
than Illinois in the instant dispute.  Therefore, the substantive
law of Pennsylvania shall apply with respect to Plaintiff's
defamation claim.

ii.  False Light

In response to the Court's directive that the parties
brief the conflict of laws issue, neither party addressed any
conflict with respect to Pennsylvania or Illinois law on the tort
of false light invasion of privacy.  As neither party has cited
to a potential conflict between these two forums, and the Court
<u>sua sponte</u> has determined that the basic elements required under
both Pennsylvania law and Illinois law are identical, the Court
finds that no conflict exists and the law of the forum controls.
<u>See</u> <u>Lucker Mfg. v. Home Ins. Co.</u>, 23 F.3d 808, 813 (3d Cir. 1994)
(avoiding choice of law question where neither party pressed the
issue and there was no apparent conflict between the laws of the
forums) (citing <u>Melville</u>, 584 F.2d at 1311 (warning courts to
avoid dicta on conflicts questions when not put in issue by the
parties).

iii. Intentional Infliction of Emotional Distress

- 31 -

As is the case with Plaintiff's false light claim, the parties have not addressed any conflict issue between the laws of Pennsylvania and Illinois with respect to Plaintiff's claim for intentional infliction of emotional distress.  Therefore, the Court will proceed on the basis that no conflict exists and apply the law of the forum to this claim.  <u>See</u> <u>id.</u>

2.   Pennsylvania versus South Africa

In order to complete the choice of law analysis, the Court must compare the laws of South Africa and Pennsylvania to determine whether any actual conflict exists, and if so, whether South Africa has a more significant interest in having its law apply to these proceedings.

i.   Defamation

With respect to the first step of the choice of law analysis, Pennsylvania and South Africa law conflict as to the burden of proving the falsity of a defamatory statement.  Under South African law, "a defendant [must] establish, once a plaintiff has proved the publication of a defamatory statement affecting the plaintiff, that the publication was lawful because the contents of the statement were true and in the public benefit."  <u>Khumalo & Others v. Holomisa</u>, 2002 (1) SA 401 (CC) at 29 (S. Afr.).  In other words, "[t]he burden of proving truth thus falls on the defendant."  <u>Id.</u> at 29-30.  This is incompatible with the controlling law in

Pennsylvania that a plaintiff must prove falsity with respect to matters of public concern.  See Am. Future Sys., 923 A.2d at 396 n.8 (Pa. 2007) (citing Phila. Newspapers v. Hepps, 475 U.S. 767, 775 (1986)); Ertel v. Patriot-News Co., 674 A.2d 1038, 1041 (Pa. 1996) ("[I]t is the burden of a public figure plaintiff . . . to show that the statements at issue are false.") (internal citation omitted).[14]

The Court concludes that this difference represents a true conflict.  As previously stated, a true conflict exists "when the governmental interests of both jurisdictions would be impaired if their law were not applied."  Lacey v. Cessna Aircraft Co., 932 F.2d 170, 187 n.15 (3d Cir. 1991) (emphasis in original).  In assigning the burden of proof of falsity to a defendant, the Constitutional Court of South Africa[15] balanced the interests involved in defamation between protection of an individual's reputation, which the Court expressed as equivalent with the value of human dignity, with the right to free expression.  Khumalo, 2002 (1) SA 401 (CC) at 25.  The court explained:

The law of defamation seeks to protect the legitimate

---

[14]    Although technically this burden-shifting requirement emanates from a federal constitutional principle, for purposes of this conflict of laws analysis, this requirement has been incorporated into Pennsylvania defamation law.

[15]    The Constitutional Court is the highest court in South Africa with respect to matters of constitutional law.

> interest individuals have in their reputation.  To this
> end, therefore, it is one of the aspects of our law which
> supports the protection of the value of human dignity.
> When considering the constitutionality of the law of
> defamation, therefore, we need to ask whether an
> appropriate balance is struck between the protection of
> freedom of expression on the one hand, and the value of
> human dignity on the other.

Id.  Likewise, the requirement that the plaintiff prove falsity

under Pennsylvania law represents a balancing of the interests of

the right to protect a reputational interest with the need to

foster public debate on certain issues while coming to a very

different conclusion.  See Hepps, 475 U.S. at 777-78.  Therefore,

as application of either law would impair the carefully crafted

balancing of interests between the respective forums, it is clear

that an actual conflict exists.

Proceeding to the next step in the conflict analysis,

the Court finds that Pennsylvania exhibits a more significant

interest in having its law on defamation apply to the instant

dispute.  As explained above, Pennsylvania obviously has a

substantial interest in this litigation as Plaintiff was

domiciled in Pennsylvania at the time the allegedly defamatory

communications were published and had a reputational interest to

protect in that forum.  South Africa, in contrast, does not have

a material interest in having its law apply to Plaintiff's

defamation claims.  It is true that the allegedly defamatory

statements made at the October Meeting were published only in

South Africa and that the events giving rise to the allegedly

defamatory statements occurred in South Africa.  Under
Pennsylvania's choice of law analysis, however, these contacts
must be examined in light of the underlying purpose of defamation
law, which is to compensate an individual for injury to her
reputation.  Viewed in this context, it is clear that Plaintiff
maintained a much stronger reputational interest in Pennsylvania
than South Africa, and therefore, Pennsylvania has a stronger
interest in having its law apply on this issue.[16]

    ii.  False Light

    As explained above, Rule 44.1 of the Federal Rules of
Civil Procedure directs that the litigants bear the burdens of
establishing foreign law and demonstrating that it differs from
United States law.  See Fed. R. Civ. P. 44.1; Bel-Ray, 181 F.3d
at 440.  Where the parties fail to carry these burdens, the Court
is empowered to presume that the foreign law is the same as that
of the United States, and need not engage in a choice of law
analysis.  See Ferrostaal, Inc. v. M/V Sea Phoenix, 447 F.3d 212,
218 (3d Cir. 2006) (refusing to engage in conflict of laws

_____

[16]    Defendants also emphasize that a conflict exists
between South Africa law and Pennsylvania law in that South
Africa has not adopted the "actual malice" requirement in the
context of defamation involving public figures, which is mandated
under Pennsylvania law by the Supreme Court's decisions in New
York Times v. Sullivan, 376 U.S. 254, 279 (1964), and Gertz v.
Robert Welch, Inc., 418 U.S. 323, 347 (1974).  For the reasons
previously discussed, the Court concludes that this represents a
true conflict and that Pennsylvania has a stronger state interest
in having its law apply based upon Plaintiff's domicile in
Pennsylvania.

analysis where the parties did not satisfy the necessary predicate of establishing Tunisian law pursuant to Fed. R. Civ. P. 44.1).  As neither party provided any authority as to the tort of false light invasion of privacy under South African law, the Court concludes that Rule 44.1 has not been satisfied.  Therefore a choice of law analysis is unnecessary and Pennsylvania law will apply.

            iii. Intentional Infliction of Emotional Distress

        As with the tort of false light, the parties have failed to satisfy their burden of conclusively establishing South African law under Rule 44.1 with respect to the cause of action for intentional infliction of emotional distress.  Therefore, the Court declines to address the choice of law question and Pennsylvania law will control.  See id.

        3.   Pennsylvania Law is Consistent with Due Process

        After resolving the choice of law issue and selecting the appropriate forum's law to be applied, the Court is required to ensure that application of this law passes constitutional muster.  "[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."  Allstate Ins. Co. v. Hague, 449 U.S. 302, 312-13 (1981); see Budget Rent-A-Car Sys, Inc. v.

Chappell, 407 F.3d 166, 175 (3d Cir. 2005); Powers v. Lycoming
Engines, 328 F. App'x 121, 125 (3d Cir. 2009) (non-precedential
opinion) (noting that once the choice of law is made, a court is
required to consider whether applying that law violates due
process).

Defendants contend that application of Pennsylvania law
is constitutionally impermissible under Haque because the only
connection to Pennsylvania is Plaintiff's "nominal residence"
there.[17]  This argument is unavailing.  As explained above,
Plaintiff was domiciled in Pennsylvania for the relevant period
of time for purposes of this lawsuit, and Plaintiff's domicil is
not an insignificant contact for purposes of applying
Pennsylvania law.  In contrast, Plaintiff being domiciled in

---

[17]    An individual's "residence" is distinguishable from his
"domicil."  The Third Circuit has recognized that "the term
'resident' has no precise meaning."  Bodin v. Brathwaite, 459
F.2d 543, 544 (3d Cir. 1972) (citing Willenbrock v. Rogers, 255
F.2d 236, 237 (3d Cir. 1958); see also United States v. Stabler,
169 F.2d 995, 998 (3d Cir. 1948).  As explained in the
Restatement:

> Domicil differs from such other places both in the nature
> of the connection and in the legal purposes for which
> such connection is important. Thus a person may be a
> "resident" or an "inhabitant" or a "citizen" of a place
> without being domiciled therein, although such
> "residence," "inhabitancy" or "citizenship," may be
> significant for some legal purposes. Many legal questions
> depend upon domicil irrespective of residence,
> inhabitancy or citizenship.

Restatement 2d. § 9, cmt. a.

Pennsylvania creates a significant state interest for Pennsylvania in providing redress for injury to Plaintiff's reputational interest.

Furthermore, as Defendants were plainly aware that Plaintiff was domiciled in Pennsylvania, and would remain so throughout the course of her employment with OWLAG (as demonstrated by the provisions of her employment contract cited above), Defendants cannot establish that application of Pennsylvania law is somehow "arbitrary or fundamentally unfair" under Haque.  Therefore, the Court concludes that application of Pennsylvania law comports with the constitutional requirements of due process.

    C.    Defamation Analysis

    The Third Circuit has emphasized the interplay between state and federal law in a defamation case, noting that "[a]lthough a defamation suit has profound First Amendment implications, it is fundamentally a state cause of action." Tucker v. Fischbein, 237 F.3d 275, 281 (3d Cir. 2001) (quoting McDowell v. Paiewonsky, 769 F.2d 942, 945 (3d Cir. 1985)).  Under Third Circuit jurisprudence, the Court must apply a two-step approach when presiding over a defamation action.  The Court must determine: "'(1) whether the defendants have harmed the plaintiff's reputation within the meaning of state law; and (2) if so, whether the First Amendment nevertheless precludes

recovery.'"  <u>Marcone</u>, 754 F.2d at 1077 (quoting <u>Steaks Unlimited,</u>
<u>Inc. v. Deaner</u>, 623 F.2d 264, 270 (3d Cir. 1980)).

Under this framework, it is only necessary to consider
the extent to which the First Amendment shields Defendants from
liability if the Court concludes that Plaintiff has adduced
sufficient evidence to show that triable issues exist with
respect to whether the allegedly defamatory statements are
capable of supporting a defamation claim under Pennsylvania law.
<u>See</u> <u>Tucker</u>, 237 F.3d at 281; <u>Nanavati v. Burdette Tomlin Mem'l</u>
<u>Hosp.</u>, 857 F.2d 96, 106 n.11 (3d Cir. 1988) ("[W]e first must
consider whether New Jersey would allow a defamation action under
the circumstances of this case.  If we believe that New Jersey
would recognize a defamation action, then we may examine whether
constitutional protections nevertheless would defeat that
action.").

1.   Pennsylvania Defamation Law

"Defamation, of which libel, slander, and invasion of
privacy are methods, is the tort of detracting from a person's
reputation, or injuring a person's character, fame, or
reputation, by false and malicious statements."  <u>Joseph v.</u>
<u>Scranton Times L.P.</u>, 959 A.2d 322, 334 (Pa. Super. Ct. 2008)
(citing <u>Zartman v. Lehigh County Humane Soc'y</u>, 482 A.2d 266, 268

(Pa. Super. Ct. 1984)).[18]

The elements of Pennsylvania defamation law are defined by statute.  In order to successfully establish a claim for defamation a plaintiff has the burden of proving:

(1) The defamatory character of the communication.[19]
(2) Its publication by the defendant.
(3) Its application to the plaintiff.
(4) The understanding by the recipient of its defamatory meaning.
(5) The understanding by the recipient of it as intended to be applied to the plaintiff.
(6) Special harm resulting to the plaintiff from its publication.
(7) Abuse of a conditionally privileged occasion.

42 Pa. C.S. § 8343(a).  Once a plaintiff establishes these elements, the defendant has the burden of proving the following, when relevant to the claim:

(1) The truth of the defamatory communication.
(2) The privileged character of the occasion on which it was published.
(3) The character of the subject matter of defamatory comment as of public concern.

Id. § 8343(b).

A statement is deemed to be defamatory "if it tends to blacken a person's reputation or expose him to public hatred,

---

[18]  Libel has been defined under Pennsylvania law as "any malicious publication that is written, printed, or painted, or procured to be written, printed, or painted, and which tends to expose a person to contempt, ridicule, hatred, or degradation of character."  Id. (citing Schnabel v. Meredith, 107 A.2d 860, 862 (Pa. 1954)).

[19]  The Pennsylvania statute and the Restatement (Second) of Torts (1977) refer to defamatory words and expressions as "communications."  Pennsylvania cases appear to use the terms "communication" and "statement" interchangeably without making a distinction between the two.

contempt, or ridicule, or injure him in his business or
profession." Joseph, 959 A.2d at 334 (citing MacElree v. Phila.
Newspapers, Inc., 674 A.2d 1050, 1054 (Pa. 1996)). "When
communications tend to lower a person in the estimation of the
community, deter third persons from associating with him, or
adversely affect his fitness for the proper conduct of his lawful
business or profession, they are deemed defamatory." Id.
(quoting Green v. Mizner, 692 A.2d 169, 172 (Pa. Super. Ct.
1997)). "It is not enough that the victim of the [statements] .
. . be embarrassed or annoyed, he must have suffered the kind of
harm which has grievously fractured his standing in the community
of respectable society." Tucker v. Phila. Daily News, 848 A.2d
113, 124 (Pa. 2004) (quoting Scott-Taylor, Inc. v. Stokes, 229
A.2d 733, 734 (Pa. 1967)). Importantly, only statements of fact,
rather than mere expressions of opinion, are actionable under
Pennsylvania law. Moore v. Cobb-Nettleton, 889 A.2d 1262, 1267
(Pa. Super. Ct. 2005) (citing Elia v. Erie Ins. Exch., 634 A.2d
657, 660 (Pa. Super. Ct. 1993)). In order for an "opinion" to be
deemed capable of defamatory meaning under Pennsylvania law, it
must "reasonably be understood to imply the existence of
undisclosed defamatory facts justifying the opinion." Remick v.
Manfredy, 238 F.3d 248, 361 (3d Cir. 2001) (internal citation
omitted).

The statements alleged to be defamatory must be viewed

in context.  Baker v. Lafayette Coll., 532 A.2d 399, 402 (Pa.

1987).  The Pennsylvania Supreme Court has explained that:

> [W]ords which standing alone may reasonably be understood
> as defamatory may be so explained or qualified by their
> context as to make such an interpretation unreasonable.
> Thus, we must consider the full context of the article to
> determine the effect the article is fairly calculated to
> produce, the impression it would naturally engender, in
> the minds of the average persons among whom it is
> intended to circulate.

Thomas Merton Ctr. v. Rockwell Int'l Corp., 442 A.2d 213, 216

(Pa. 1981).

        Pennsylvania courts recognize that a claim for

defamation may exist where the words utilized themselves are not

defamatory in nature, however, the context in which these

statements are issued creates a defamatory implication, i.e.,

defamation by innuendo.  Accord Thomas Merton, 442 A.2d at 217;

Bogash v. Elkins, 176 A.2d 677, 679 (Pa. 1962); Sarkees v.

Warner-W. Corp., 37 A.2d 544, 546 (Pa. 1944) (all discussing

defamation by innuendo).  The Pennsylvania Supreme Court has

expounded upon the concept of defamation by innuendo as follows:

> The purpose of an innuendo, as is well understood, is to
> define the defamatory meaning which the plaintiff
> attaches to the words; to show how they come to have that
> meaning and how they relate to the plaintiff[.] But it
> cannot be used to introduce new matter, or to enlarge the
> natural meaning of the words, and thereby give to the
> language a construction which it will not bear[.] It is
> the duty of the court in all cases to determine whether
> the language used in the objectionable article could
> fairly and reasonably be construed to have the meaning
> imputed in the innuendo. If the words are not susceptible
> of the meaning ascribed to them by the plaintiff and do
> not sustain the innuendo, the case should not be sent to

> a jury . . . . [Consequently,] [i]f the publication
> complained of is not in fact libelous, it cannot be made
> so by an innuendo which puts an unfair and forced
> construction on the interpretation of the publication.

Sarkees, 37 A.2d at 546 (internal quotation marks and citations

omitted).  In order to succeed on such a claim, the "innuendo

must be warranted, justified and supported by the publication."

Livingston v. Murray, 612 A.2d 443, 449 (Pa. Super. Ct. 1992)

(quoting Thomas Merton, 442 A.2d at 217).

Similarly, the Superior Court of Pennsylvania has

recognized that "the literal accuracy of separate statements will

not render a communication 'true' where . . . the implication of

the communication as a whole was false."  Dunlap v. Phila.

Newspapers, Inc., 448 A.2d 6, 15 (Pa. Super. Ct. 1982).  Although

the Pennsylvania Supreme Court has never addressed this theory of

defamation-by-implication, courts applying Pennsylvania law have

found that even where the complained-of statements are literally

true, if, when viewed in toto, the accurate statements create a

false implication, the speaker may be liable for creating a

defamatory implication.  See Allied Med. Assocs. v. State Farm

Mut. Auto. Ins. Co., No. 08-02434, 2008 WL 4771850, at *4 n.3

(E.D. Pa. Oct. 30, 2008) (finding that defamation by implication

is a cognizable legal theory under Pennsylvania law); Franklin

Prescriptions, 267 F. Supp. 2d at 434-35 (applying Pennsylvania

law and concluding that an article was actionable where certain

information was omitted which resulted in a defamatory

implication that the plaintiff was involved in the unlawful sale of prescription drugs); Fanelle v. Lojack Corp., No. 99-4292, 2000 WL 1801270, at *2-3 (E.D. Pa. Dec. 7, 2000) (concluding that a claim for defamation-by-implication is viable under Pennsylvania law and finding that a promotional package issued by a vehicle theft detection company that included an undisputedly true article documenting plaintiff's arrest for vehicle theft charges was capable of defamatory meaning because taken as a whole it created the implication that the plaintiff was a thief).

     2.   Analysis under Pennsylvania Law

Based on the legal framework set forth above, the Court will rigorously examine the statements made during the October Meeting and the November Press Conference to determine whether the allegedly defamatory communications are actionable under Pennsylvania law.  Defendants do not contest that the publication element is present with respect to each of the statements in this case.  Thus, a determination of Defendants' motion for summary judgment on Plaintiff's defamation claim can be distilled to the following questions: (1) whether the statements are capable of defamatory meaning under Pennsylvania law; and (2) whether the statements are "of or concerning" Plaintiff.[20]

--------

[20]    The Court must also address whether Plaintiff has demonstrated the required damages in order to withstand Defendants' motion for summary judgment.  See 42 Pa. C.S. § 8343(a)(6).  As explained in further detail below, as the allegedly defamatory statements all concern Plaintiff's

i.   Capable of Defamatory Meaning

Whether the statements at issue are capable of defamatory meaning is a question of law to be decided by the Court.  Blackwell v. Eskin, 916 A.2d 1123, 1125 (Pa. Super. Ct. 2007) (citing Tucker, 848 A.2d at 124).  In making this legal determination, the Court must view the statement in the factual context in which it was made.  See Baker, 532 A.2d at 402; Agency Servs., Inc. v. Reiter, 513 F. Supp. 586, 587-88 (E.D. Pa. 1981) (in assessing whether statements are capable of defamatory meaning "a court must weigh both the language of the communication, and the context in which the communication is made") (citing Pierce v. Capital Cities Comm'ns, Inc., 576 F.2d 495, 502 (3d Cir. 1978)).  The touchstone in determining whether a statement is capable of defamatory meaning is how the statement would be interpreted by the average person to whom it was directed.  See Marier v. Lance, Inc., No. 07-4284, 2009 WL 297713, at *3 (3d Cir. Feb. 9, 2009) ("In analyzing whether or not a statement is defamatory, Pennsylvania courts have held that "[t]he nature of the audience seeing or hearing the remarks is . . . a critical factor in determining whether the communication is capable of a defamatory meaning.") (internal citation omitted); Green, 692 A.2d at 172 (stating that an assessment of whether a

---

competence in her chosen profession, they fall into the category of defamation per se and require Plaintiff only to prove general, rather than special damages.  See infra note 24.

statement is defamatory requires the court to "consider the effect of the entire article and the impression it would engender in the minds of the average reader among whom it is circulated"); see also Fischbein, 237 F.3d at 283 (reviewing statements in order to determine "the impression that they were likely to engender in the minds of the average reader"); St. Surin v. V.I. Daily News, Inc., 21 F.3d 1309, 1317 (3d Cir. 1994) ("In defamation actions, words should be construed as they would be understood by the average reader.") (internal citation omitted). For example, a court should consider the nature of the readership of a publication in determining whether a statement contained therein is capable of defamatory meaning.  See, e.g., Sellers v. Time, Inc., 423 F.2d 887, 890-91 (3d Cir. 1970) (applying Pennsylvania law and considering the level of sophistication when compared with the average reader in determining whether an article is capable of defamatory meaning); Sprague v. Am. Bar Ass'n, No. 01-382, 2001 WL 1450606, at *2 (E.D. Pa. Nov. 14, 2001) (Yohn, J.) (considering the average reader of the ABA Journal in determining whether the term "fixer" was capable of defamatory meaning).  "If the court deems a statement capable of defamatory meaning, the jury must determine if recipients of the communication have understood it to be defamatory." Wilson, 970 F. Supp. at 415 (internal citations omitted).

ii. Of and Concerning Plaintiff

- 46 -

Under Pennsylvania's defamation statute, a plaintiff must demonstrate that the complained-of statement applies to her, i.e., whether it is "of and concerning" her. See 42 Pa. C.S. § 8343(a)(3), (5). In determining whether Plaintiff has satisfied this burden, the test to be applied is whether the "defamatory communication may reasonably be understood as referring to the plaintiff." Zerpol Corp. v. DMP Corp., 561 F. Supp. 404, 410 (E.D. Pa. 1983) (citing Farrell v. Triangle Publ'ns, Inc., 159 A.2d 734 (Pa. 1960)). "It is not enough that plaintiff understands the communication to be about him." Id. It is true, however, that under Pennsylvania law, "a defamed party need not be specifically named in a defamatory statement in order to recover, if she is pointed to by description or circumstances tending to identify her." Weinstein v. Bullick, 827 F. Supp. 1193, 1199 (E.D. Pa. 1993) (citing Redco Corp. v. CBS, Inc., 758 F.2d 970, 972 (3d Cir. 1985)); Cosgrove Studio & Camera Shop, Inc. v. Pane, 182 A.2d 751, 753 (Pa. 1962)). At the summary judgment stage, in a case where the plaintiff is not identified by name, the court must find that a recipient could reasonably conclude that the publication refers to the plaintiff. Weinstein, 827 F. Supp. at 1199 (citing Farrell, 159 A.2d at 739).[21]

---

[21]    Although Weinstein was decided at the summary judgment stage while Farrell was decided at the motion to dismiss stage, both decisions address whether the facts alleged were sufficient

The Court will address these two questions and
bifurcate the allegedly defamatory statements into two categories
for purposes of summary judgment (1) actionable statements, and
(2) non-actionable statements.

iii. Specific Statements at Issue

Plaintiff has identified certain statements by Winfrey
from the October Meeting and the November Press Conference which
she claims are capable of defamatory meaning.[22]  In Corabi v.
Curtis Publishing Co., 273 A.2d 899 (Pa. 1971), abrogated on
other grounds as recognized by Dunlap, 448 A.2d at 13, a leading
Pennsylvania case on defamation, the Pennsylvania Supreme Court
articulated the procedure for determining whether allegedly
defamatory statements are to be presented to the jury.  It is the
function of the Court to determine whether the statements relied
upon by Plaintiff are capable of defamatory meaning.  To put it
another way, under Pennsylvania law, the Court acts as a
gatekeeper to determine whether the statements are incapable of
defamatory meaning in deciding whether any basis exists to

---

to identify the plaintiff in order to support a defamation claim.

[22]      Plaintiff initially filed suit in state court, and
under Pennsylvania procedural law, the complaint on its face must
"specifically identify what allegedly defamatory statements were
made by whom and to whom."  Smith v. Sch. Dist. of Phila., 112 F.
Supp. 2d 417, 430 (E.D. Pa. 2000) (noting that under Pennsylvania
procedural law a complaint, on its face, must specifically
identify the allegedly defamatory statements) (citing Ersek v.
Twp. of Springfield, 822 F. Supp. 218, 223 (E.D.Pa. 1993), aff'd
102 F.3d 79 (3d Cir. 1996)).

proceed to trial.  See Tucker, 848 A.2d at 123-24 (citing Thomas

Merton, 442 A.2d at 215-16).  In accordance with Corabi, the

Court will examine the passages relied on by Plaintiff

individually but will consider their meaning in light of the

surrounding context in which each statement was made.[23]  Id. at

905-06.  The statements made during the October Meeting and the

November Press Conference are addressed in turn.

### a.    October Meeting

#### (1) Actionable Statements

(1) *And I said to the girls that any person that has caused
harm to any of them will no longer be allowed to work at this
school.  And thus far, we have removed all of the dorm parents.
I've spoken to [Plaintiff] and I said to [Plaintiff] that I don't
know what she knows because the investigation is continuing.  I
don't know what she knows, or knew, or didn't know, but that I
have lost confidence in her ability to run this school.  And
therefore, she will not be returning to this school.*

When viewed in context, these statements are capable of

defamatory meaning.  The average listener could interpret

Winfrey's statement that she has "lost confidence" in Plaintiff's

abilities, in conjunction with the preceding statement that "any

person that has caused harm" to the students would not be

---

[23]    Under Pennsylvania law, no prescribed guidelines exist
for the Court in sequestering the "statements" to be examined
from the "communication" as a whole.  In order to perform its
gatekeeping function, the Court places the complained-of
statements in context in accordance with the natural meaning as
would be ascribed by the average listener.  In other words, for
purposes of determining whether the statements are capable of
defamatory meaning at the summary judgment stage, the Court
groups the allegedly defamatory statements into numbered passages
that "march to the same beat."

returning to OWLAG, to mean that Plaintiff was not being retained
due to the fact that she played some role in the "harm" caused to
the students.  Further, Winfrey's statement that she is uncertain
what Plaintiff "knows, or knew, or didn't know" does not negate
the implication that Plaintiff was aware of the misconduct by the
Dorm Parents.  The implication that Plaintiff was aware of abuse
by the Dorm Parents and did not react accordingly is capable of
defamatory meaning as it ascribes conduct which would render her
unfit for her profession as an educator.  See Maier v. Maretti,
671 A.2d 701, 704 (Pa. Super. Ct. 1995) ("A communication is also
defamatory if it ascribes to another conduct, character or a
condition that would adversely affect his fitness for the proper
conduct of his proper business, trade or profession.") (citation
omitted), see, e.g., Dougherty, 547 A.2d at 783 (letter from a
former patient which impugned the professional competence of a
chiropractor based upon the quality of the treatments provided
was capable of defamatory meaning).

Defendants contend that Winfrey's statement that she
"lost confidence" in Plaintiff's ability represents a statement
of opinion, which, if so, is non-actionable.  The benchmark for
determining whether a statement of opinion is capable of
defamatory meaning is whether the opinion "may reasonably be
understood to imply the existence of undisclosed defamatory facts
justifying the opinion."  Veno v. Meredith, 515 A.2d 571, 575

- 50 -

(Pa. Super. Ct. 1986) (quoting <u>Beckman v. Dunn</u>, 419 A.2d 583, 587 (Pa. Super. Ct. 1980)); <u>see generally</u> <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 18 (1990) (recognizing that "expressions of 'opinion' may often imply an assertion of objective fact").  The importance of the distinction between an opinion which discloses its underlying facts and one that implies the existence of undisclosed facts was explained by the Third Circuit in the <u>Redco</u> decision:

> Although there may be no such thing as a false opinion, an opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea. If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject it on the basis of an independent evaluation of the facts. However, if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion.

758 F.2d at 972.  Whether a statement qualifies as a true opinion or an "opinion" which implies the existence of undisclosed derogatory facts is a question of law to be resolved by the Court.  <u>See</u> <u>Green</u>, 692 A.2d at 174 (citing <u>Mathias v. Carpenter</u>, 587 A.2d 1, 2-3 (Pa. Super. Ct. 1991)); <u>Elia</u>, 634 A.2d at 660 (citing <u>Braig v. Field Comm'ns</u>, 456 A.2d 1366, 1372-73 (Pa. Super. Ct. 1983)).

Winfrey did not disclose the underlying facts which supported her opinion that she did not have confidence in Plaintiff's ability to serve as Headmistress.  Without the disclosure of these underlying facts, this "opinion" implies that

Winfrey's judgment is based, at least in part, on Winfrey's knowledge arising from the internal investigation at OWLAG.  Cf. Redco, 758 F.2d at 972 (finding opinion disclosing underlying facts not defamatory because "a listener may choose to accept or reject [the opinion] on the basis of an independent evaluation of the facts"); Parano v. O'Connor, 641 A.2d 607 (Pa. Super. Ct. 1994) (finding that defamatory comments that appellant was "adversarial, less than helpful, and uncooperative" incapable of defamatory meaning because they were subjective opinions based on disclosed facts); Baker, 532 A.2d at 402 (finding that a letter written by dean regarding an art professor's performance was not defamatory where it was expressed conclusions based upon an investigation of the art department and actually disclosed the facts gleaned from the investigation underlying the complained-of statements).

    Furthermore, the criticism of Plaintiff's job performance emanating from Winfrey, when received by the average listener, implies the existence of some undisclosed facts since it is reasonable to presume that Winfrey, as Plaintiff's superior, would be knowledgeable as to the substance of Plaintiff's job performance.  See Roffman v. Trump, 754 F. Supp. 411, 419 (E.D. Pa. 1990) (denying summary judgment and finding that disparaging comments as to investment analyst's job performance were capable of defamatory meaning since "there can

be little doubt that a person who hears someone criticizing another's job performance would presume that the person doling out the disparaging comments possessed knowledge of some facts on which to base the criticism"); Ramsey v. AT&T Corp., No. 97-1301, 1997 WL 560183, at *6 (E.D. Pa. Aug. 27, 1997) (finding that statements made by human relations director were capable of defamatory meaning since an average recipient could infer that the assessment of the plaintiff's work performance was based on undisclosed information).  Therefore, in light of the fact that Winfrey's statements imply the existence of facts indicating some level of Plaintiff's knowledge and/or involvement in the abuse allegations, these statements do not qualify as non-actionable opinion.

These statements explicitly identify Plaintiff and concern Winfrey's conclusion that she has "lost confidence" in Plaintiff's competence as Headmistress.  These statements unquestionably are "of and concerning" Plaintiff.

The Court concludes that summary judgment should not be granted with respect to the above-statements.

(2)  *15 girls had come to [Samuel's] office to say that there was a problem at the school, that . . . he was their last resort.  They said that they had tried to tell [Plaintiff], the head of school, and that she had not taken them seriously, that on one occasion I learned that a group of girls had written [Plaintiff] a letter to complain about one dorm parent, specifically one dorm parent.  And instead of removing that dorm parent, or chastising that dorm parent, or suspending that dorm parent, apparently [Plaintiff] spoke to the dorm parent, told the dorm parent about the letter the girls had written to her and*

- 53 -

*then that dorm parent went back and raided the dorm and forced*
*all the girls to say who had written the letter.*

With respect to the issue of whether these statements
are capable of defamatory meaning, Plaintiff contends that the
statement that she did not take the complaints of the students
"seriously" amounts to an allegation that she ignored the
complaints of abuse.  Defendants respond that Winfrey's
characterization that Plaintiff did not take the students'
complaints "seriously" constitutes a non-actionable expression of
opinion.

When viewed in context, the implication that Plaintiff
did not take complaints of mistreatment by the Dorm Parents
"seriously" is capable of defamatory meaning because it connotes
that Plaintiff failed in her role as an educational administrator
to respond effectively to the students' allegations of abuse.
See Maier, 671 A.2d at 704.  This implication is supported by the
fact that 15 students whom Plaintiff did not take "seriously"
sparked the controversy at OWLAG by alerting Samuel to instances
of abuse.

The Court rejects Defendants' argument that this
statement amounts only to a non-actionable opinion.  Winfrey
failed to disclose any of the underlying facts demonstrating that
Plaintiff did not take the complaints "seriously," and in light
of the ongoing internal investigation, this statement hints at
the existence of undisclosed facts that Plaintiff did not respond

- 54 -

appropriately to the students' complaints.  Therefore, the Court concludes that this statement is a non-opinion that is capable of defamatory meaning.

As to the question of whether these statements are "of and concerning" Plaintiff, the statements clearly reflect that the complaints were presented to Plaintiff herself and the substance of the statements concern Plaintiff's reaction to these complaints.  Thus, this question is answered in the affirmative.

Therefore, summary judgment is inappropriate with respect to these statements.

(3) *What happened here with the leadership is that the parents were shut out, the children were shut out, the teachers were shut out, and only - the only authority came from the dorm parents.  The dorm parents were allowed to rule and given power over the girls.  I cant' I can't I can't even explain how that could happen.  I don't know how it happened.  I spoke to [Plaintiff] the other day and I told her that I didn't think that it would be wise for her to continue at the school.  I said, but just please tell me this one thing.  How is it that these dorm parents were given such power and authority over the girls?  With no checks and balances? Nobody to check on them.  And she said you don't understand.  There were checks and balances.  And I don't see where they were.*

A fair reading of these statements is that Plaintiff bore responsibility for allowing the Dorm Parents to "rule" and exercise uncurbed authority over the OWLAG students.  Winfrey's statements could be interpreted by the average listener to imply that Plaintiff failed in her obligation to "check" the authority of the Dorm Parents and guard against mistreatment of the students.  A charge that Plaintiff failed to prevent the Dorm

Parents from exercising unabridged "power" over the students, in light of the backdrop of the abusive treatment by the Dorm Parents, impugns Plaintiff's prowess as a responsible educational professional. <u>See</u> <u>MacElree</u>, 674 A.2d at 1054 (finding that a statement that a district attorney was "electioneering and was the David Duke of Chester County," could lead a reasonable person to conclude that this was an accusation of abuse of the power as district attorney, an accusation that amounted to a charge of misconduct in office and thus capable of defamatory meaning as a matter of law).

Defendants' position is that Winfrey's statements that the teachers and parents were "shut out," that the Dorm Parents were "allowed to rule" and that no "checks and balances" existed constituted merely non-actionable statements of disagreement of opinion. The Court rejects this position. Winfrey discloses no facts in support of any of these conclusions, particularly that Plaintiff failed to institute "checks" on the authority of the Dorm Parents. Absent such disclosure, these "opinions" imply the existence of undisclosed derogatory facts, particularly in light of the internal investigation, that Plaintiff failed in her duty to monitor against misuse of power by the Dorm Parents.

As to the question of whether these statements are "of and concerning" Plaintiff, they clearly reference Plaintiff directly by name and relate to Winfrey confronting her about the

lack of "checks and balances" with respect to the authority of
the Dorm Parents over the students.  Furthermore, Winfrey
references the "leadership" at OWLAG as being responsible for
allowing the Dorm Parents to exercise unchecked authority.
Plaintiff's position is that the term "leadership" would be
understood as referring to her based on her position as
Headmistress.  The Third Circuit has recognized that an
individual may assert a defamation claim as a group according to
the following guidelines:

> Individual group members may sue based upon statements
> about a group when the statements were directed toward
> a comparatively small class or group all of whose
> constituent members may be readily identified and the
> recipients of the [statements] are likely to identify
> some, if not all, of them as intended objects of the
> defamation.  But no claim arises from a defamatory
> remark directed toward a group whose membership is so
> numerous that no individual member can reasonably be
> deemed its intended object. Similarly, no claim exists
> if, for any other reason, a reader could not reasonably
> conclude that the statements at issue referred to the
> particular person or persons alleging defamation.

Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1015 (3d
Cir. 1994) (internal quotation marks and citations omitted).
Here, the term "leadership" relates to a readily identifiable
group of individuals at OWLAG, of which Plaintiff would be a
member.  Therefore, this "of and concerning" requirement has been
satisfied for purposes of summary judgment.

As the Court concludes that both of the above questions
are answered in the affirmative, the Court will deny Defendants'

motion for summary judgment with respect to these statements.

(4) *The teachers felt shut out.  The teachers were not allowed to participate in activities where the dorm parents were involved in.  The teachers weren't allowed - the way the system was supposed to work is that the nurses were over the dorm parents, but the nurses were then not allowed to say anything to the dorm parents.  So the dorm parents were completely empowered to do what they want, and whenever they wanted to do it, and um, thought that they were protected by [Plaintiff].  And your girls will tell you as they told me that they said there is nothing you can do to us.  There is nothing you can do to us because we're protected by [Plaintiff].*

With respect to the issue of whether these statements are capable of defamatory meaning, Plaintiff contends that the innuendo created by these statements is that Plaintiff empowered the Dorm Parents to mistreat the students.  Winfrey recites that the students were told by the Dorm Parents that Plaintiff would protect the Dorm Parents against any complaints of abuse.  Even if this statement was literally true it creates an implication in that the Dorm Parents believed they were "protected" by Plaintiff.  See Dunlap, 448 A.2d at 15 (recognizing that "the literal accuracy of separate statements will not render a communication 'true' where . . . the implication of the communication as a whole was false").  In other words, a fair reading of this statement to the average listener is that Plaintiff must have taken some action to "protect" the Dorm Parents in order for the Dorm Parents to form such a belief.  An implication that Plaintiff took any action to "protect" the Dorm Parents despite their mistreatment is capable of defamatory

meaning by impeaching Plaintiff's reputation as a responsible and competent educator.

As to the second question, Defendants contend that these statements are not "of and concerning" Plaintiff because they are limited to the actions taken by the Dorm Parents only. This argument is inapposite.  As explained above, a reasonable innuendo created by these statements is that Plaintiff herself behaved in such a fashion as to create a belief in the Dorm Parents that they were "protected" by her against complaints from students.  This innuendo shifts the focus of the statements away from the Dorm Parents to the actions by Plaintiff in protecting the Dorm Parents.  Viewed in this light, the average listener could interpret that these statements refer to Plaintiff's role in "empowering" the Dorm Parents.

Based on the above, Defendants' motion for summary judgement with respect to these statements will be denied.

(5) *My mistake was trusting people, putting them in power, and allowing them to rule without me having daily contact to see what was going on.*

First, the Court must address whether this statement is capable of defamatory meaning.  Fairly read, this statement conveys that Winfrey made a "mistake" by "trusting people" with power, and the result was the abusive behavior by the Dorm Parents.  In other words, the individuals referred to "in power" were untrustworthy and acted in a manner that facilitated the

mistreatment of OWLAG students.  Applying such a charge to
Plaintiff obviously is capable of defamatory meaning because it
impugns her trustworthiness and competence in her professional
field.

Defendants argue that Winfrey cannot be held liable for
this statement as it represents only her subjective opinion.
Winfrey's statement, however, does not reveal the underlying
factual bases as to exactly her trust was betrayed, i.e., why it
was a "mistake" to "trust" these "people."  See Remick, 238 F.3d
at 261-62 (noting that only opinions which disclose their
underlying facts can be considered non-defamatory).  Fairly read,
Winfrey's characterization of her decision to delegate authority
with respect to the students as a "mistake" implies the existence
of undisclosed facts unearthed during the internal investigation
which indicated that the people put in "power," i.e., Plaintiff,
were engaged in wrongdoing.  Therefore, the Court concludes that
this does not represent merely a subjective opinion on the part
of Winfrey, but instead is capable of defamatory meaning.

Next, it is necessary to address whether this statement
can be construed as "of and concerning" Plaintiff.  Plaintiff
asserts that Winfrey's statement references people in "power" and
that, in light of Winfrey's other comments during the October
Meeting, the average listener would understand this as a
reference to Plaintiff.  Plaintiff's position as Headmistress

obviously placed her as a person in "power" with respect to the administration of OWLAG, particularly in light of the fact that the average listener during the October Meeting was relatively familiar with the authority structure of OLWAG's administration. See Sellers, 423 F.2d at 890-91 (applying Pennsylvania defamation law and considering the effect of the complained-of statements on the "average" reader).  The Court concludes that, drawing all reasonable inferences in Plaintiff's favor, an average recipient could reasonably conclude that this statement refers to Plaintiff.

Based on the above analysis, summary judgment is not warranted with respect to this statement.

(6) *And I happened to be um walking down the street of living one day and one girl was sitting on the side and she was crying.  And I saw her crying and you know stopped to say why are you crying?  And she had just come from seeing the psychologist here and said she was having a hard time saying things to the psychologist.  And we sat there and we talked and [Plaintiff] walked by and saw us sitting there talking and I could tell she was not . . . she didn't appear to be happy with the fact that I was sitting there talking to the girl.  And the girl was crying and . . . uh I said oh we're fine, we're fine, we're okay.  We were just having conversation and um the girls later told me that they were told never to cry to me again . . . never to cry to me again.  They were told that when I showed up to put on a happy face.  And so um I don't know if I had been here whether anybody would have felt that they could actually have told me.  We now know.*

First, the Court concludes that the statements that the OWLAG students were "told never to cry to me again" and "to put on a happy face" with respect to Winfrey, when viewed in context, are capable of defamatory meaning.  The preceding sentences

relate an anecdote in which Winfrey observed Plaintiff's displeasure that a student was talking (and presumably complaining) directly to Winfrey.  The sentence following these statements addresses whether any of the OWLAG students "would have felt that they could actually have told [Winfrey]," about their mistreatment.  Read together, these statements create a reasonable inference that Plaintiff was responsible for suppressing the OWLAG students ability to communicate with Winfrey about the abusive treatment.  When viewed in terms of the innuendo created by these statements, the implication to the average listener could be that Plaintiff was complicit in allowing the mistreatment to continue.  Based on Plaintiff's status as an educator, such a charge is capable of defamatory meaning in that it adversely affects her fitness concerning the proper conduct of her profession.  See Joseph, 959 A.2d at 334.

Second, Defendants do not contest that these statements clearly qualify as "of and concerning" Plaintiff.  The anecdote relayed by Winfrey expresses that Plaintiff was discomforted by Winfrey's direct contact with a student immediately prior to Winfrey's statements that the girls "were told" to "never cry" to Winfrey and "put on a happy face."  This supports the conclusion that an average listener could reasonably conclude that these statements apply to Plaintiff.

Therefore, the Court will deny Defendants' motion for

summary judgment with respect to these statements.

(7) *I don't know how long it would have taken for somebody to have shared this with me because the girls were told by [Plaintiff] that I knew everything that was going on, and told by [Plaintiff] that I spoke to her everyday and that I approved of the way she was doing everything.*

The Court concludes that this statement was capable of defamatory meaning because it creates an innuendo that Plaintiff was untruthful in her communications with Winfrey.  In determining whether an allegedly defamatory statement is capable of defamatory meaning, the Court must look at what a recipient either "correctly, or mistakenly but reasonably, understands" the communication to mean.  See Clemente v. Espinosa, 749 F. Supp. 672, 676-77 (E.D. Pa. 1990) (quoting Restatement (Second) of Torts § 563 (1977)).  Fairly read, Winfrey's statements indicate that Plaintiff was telling the OWLAG students that she was relaying certain information to Winfrey when, according to Winfrey, this was not the case.  By implication, this statement characterizes Plaintiff as an untruthful person, both in dealing with her superior (Winfrey) and the children under her supervision (the OWLAG students).  Therefore, the Court finds that it is capable of defamatory meaning as it exposes Plaintiff to disrepute with respect to her professional reputation.

Furthermore, the Court has no trouble concluding that this statement is "of and concerning" Plaintiff in that she is named explicitly and the substance of the statement concerns

Plaintiff's behavior.  Defendants do not contest that this
element is present with respect to this statement.

(8) *I'm going to find a new head of the academy for the
school.  I'm going to involve the parents, and involve the girls
themselves in creating the discipline process because as I've
said to them: dorm parents are gone, [Plaintiff] is gone.*

The Court concludes that this statement is capable of
defamatory meaning on the basis of defamation by innuendo.  It is
true that the thrust of this statement merely describes Winfrey's
thoughts on her approach to finding a new head of academy for
OWLAG and instituting a new disciplinary process.  Although it is
undisputed that Plaintiff was no longer employed by OWLAG at the
time this statement was made, the critical point in determining
whether this statement constitutes defamation by innuendo is that
Plaintiff's removal is grouped together with the removal of the
Dorm Parents.  A fair reading of Winfrey's statement is that the
disciplinary process which previously existed was defective, and
that both the Dorm Parents and Plaintiff were removed as a result
of this deficiency.  Based on the backdrop in which the October
Meeting was held, i.e., discussing allegations of physical and
sexual abuse, the innuendo created by this statement is that
Plaintiff and the Dorm Parents were both culpable in the
breakdown of OWLAG.  Again, the import of this statement is that
Plaintiff played some role in the mistreatment of the students,
which clearly would tend to "blacken" Plaintiff's reputation or
injure her in her profession.  <u>See</u> <u>Joseph</u>, 959 A.2d at 334.

Therefore, this statement is capable of defamatory meaning.

Furthermore, the Court finds that this statement is "of
and concerning" Plaintiff as she is named directly and the
substance of this statement concerns Winfrey's strategy for
finding a new Head of Academy.

Therefore, the Court finds that summary judgment is not
warranted with respect to this statement.

(9)  *As I move forward, I want to create an environment
where girls feel empowered to take their voices back because
unknown to me they were silenced in ways that I could not imagine
. . . silenced in ways I couldn't imagine.*

First, as to defamatory meaning, Plaintiff contends
that Winfrey's characterization of the OWLAG students being
"silenced" is akin to charging Plaintiff with repressing the
students' allegations of physical and sexual abuse.  Defendants
respond that the use of the term "silenced" is not capable of
defamatory meaning since it constitutes only rhetorical
hyperbole.  See Remick, 238 F.3d at 262-63 (finding that the term
"extort" was not defamatory in nature and only non-actionable
hyperbole in describing contract negotiations); see also Redco,
758 F.2d at 972 (upholding district court's classification of
"catchy phrases or hyperbole" as non-actionable under
Pennsylvania law).

The context in which this statement was made, i.e., a
meeting discussing allegations of physical and sexual abuse
concerning the OWLAG students and the circumstances in which this

abusive conduct came to light, informs the Court's analysis as to
its defamatory meaning.  In light of this context, a reasonable
interpretation of the statement is that the term "silenced"
refers to the suppression of the OWLAG students' complaints of
abusive treatment.  A statement implying Plaintiff's involvement
in "silencing" or suppressing complaints of abuse would injure
her reputation as an educator.  Cases finding that hyperbolic
language is not actionable do so on the ground that the words
used reflect an unrealistic exaggeration rather than an actual
description of an underlying wrongful act.  In contrast, the
allegations concerning the "silencing" of the students here are
not hyperbolic in that they convey a specific meaning describing
the alleged wrongful act of ignoring the students' complaints.
Cf. Remick, 238 F.3d at 262-63 (the term "extort" was non-
actionable rhetorical speech when describing negotiations between
attorneys as it would not be understood to imply that the crime
of extortion had actually occurred); Greenbelt Coop. Publ'g Ass'n
v. Bresler, 398 U.S. 6, 14 (1970) (finding the term "blackmail"
not defamatory because no reader could have thought that
plaintiff was being charged "with the commission of a criminal
offense").  Therefore, this statement is capable of defamatory
meaning.

    Second, the Court addresses whether this statement
could be construed as "of and concerning" Plaintiff, which

- 66 -

requires a determination of whether the "defamatory communication
may reasonably be understood as referring to the plaintiff."
Zerpol Corp., 561 F.Supp. at 410 (citation omitted).  On its
face, Winfrey's statement does not indicate which individual, or
individuals, were responsible for "silencing" the students.
However, there are several statements made by Winfrey throughout
the October Meeting which insinuate that Plaintiff censored
and/or ignored complaints from the students regarding their
mistreatment by the Dorm Parents.  In light of this context, the
Court finds that an average listener could reasonably conclude
that this statement refers to Plaintiff.

Therefore, summary judgment is not warranted with
respect to this statement.

(10) *And because of the way the girls were managed, in
particularly by the dorm parents, all of this was allowed to
happen.*

First, the Court concludes that this statement is
capable of defamatory meaning.  The reference to "all of this,"
when viewed in context, pertains to the abusive treatment of
OWLAG students.  Thus, the statement indicates that the people
who were responsible for the "way the girls were managed" were
responsible for the abusive treatment of the students.  This
statement is capable of defamatory meaning in that it would be
interpreted as injurious to Plaintiff's reputation as a competent
educational professional.

Second, the Court addresses whether this statement refers to Plaintiff.  <u>See</u> 42 Pa. C.S. § 8343(a)(3).  The complained-of statement expresses that OWLAG students were mismanaged, and specifically references the Dorm Parents role in this mismanagement without explicitly naming Plaintiff.

Here, the Court concludes, however, that an average listener could reasonably conclude that this statement applies to Plaintiff on two grounds.  One, throughout the entire October Meeting Winfrey references Plaintiff as bearing responsibility for managing the students.  Two, the precise terms of the statement do not limit its application to the Dorm Parents alone.  Winfrey's statement criticizes the management of the students "<u>particularly</u> by the dorm parents," which dictates that the intended scope of the statement includes individuals other than the Dorm Parents. In light of these facts, the Court finds that a recipient could reasonably conclude that this statement is "of and concerning" Plaintiff.

Based on the above, summary judgment is not appropriate in favor of Defendants with respect to these statements.

(11)  *You know all the girls wrote me a letter . . . I bought all the girls stationary just so the girls could write me letters, and then found out that – just found out this week - anything they wrote me was supervised and checked . . . Checked ahead of time.  So when [Plaintiff] left for the week, Sam said to the girls you can write Mama Oprah anything you want.  We'll seal the letter.  No one will see it but you.*

With respect to whether these statements are capable of

defamatory meaning, Plaintiff argues that she is portrayed as a
person who withheld information concerning the abuse of the OWLAG
students.  A natural implication of this statement is that
Plaintiff supervised or monitored the content of the letters sent
to Winfrey from OWLAG students, and may have censored information
concerning allegations of abuse.  This statement, when viewed
against the backdrop of the October Meeting, is capable of
exposing Plaintiff to disrepute in her profession on the ground
that censoring the content of the students' letters with respect
to abusive treatment is clearly inconsistent with the duties of a
school administrator.  Therefore, the Court concludes this
statement is capable of defamatory meaning.

        Further, Defendants do not dispute that these
statements are "of and concerning" Plaintiff as she is clearly
referenced by name and the substance of the statements relates to
Plaintiff's departure from OWLAG and the corresponding ability of
the students to write uncensored letters to Winfrey.

    (12) *I was told, I mean [Plaintiff] was responsible for um
electing two parents because [Plaintiff] is the one who had the
most contact with the parents to that board.  And she told me the
name of two parents who are supposed to be apart [sic] of that
board.  I later found out that they aren't on that board, but I
certainly had been told that they were um uh two parents
particularly . . . was told was on the board.*

        First, as with the previous statement, Winfrey's
characterization of her communications with Plaintiff portrays
her as an untruthful individual and is clearly capable of

defamatory meaning.   Specifically, Winfrey indicates that she had

been told, presumably by Plaintiff, that certain parents were

involved with a governance board.   The meaning of this statement

to the average listener is that Plaintiff was untruthful, or at

least careless, in reporting this information to Winfrey.   In

either event, this characterization is capable of defamatory

meaning in that it impugns Plaintiff's fitness for her profession

as a competent educational administrator.   See Rockwell v.

Allegheny Health, Educ. & Research Found., 19 F. Supp. 2d 401,

405-07 (E.D. Pa. 1998) (repeated assertions that employee abused

his time off implies immoral and dishonest behavior which is

capable of defamatory meaning under Pennsylvania law).

Therefore, the Court finds that this statement is capable of

defamatory meaning.

        Second, these statements undoubtedly are "of and

concerning" Plaintiff in that she is the focal point of these

statements.   Defendants do not argue that these statements would

not be understood by the average listener to refer to Plaintiff.

        For these reasons, the Court will deny Defendants'

summary judgment motion with respect to these statements.

### (2) Non-actionable statements

        (13) *It was my intention by putting somebody in charge*
*who was African, and was female . . . I believe that she would*
*care as much for these girls as I do myself.   I'm sorry I was let*
*down.*

        The Court concludes that these statements are not

capable of defamatory meaning.  Fairly read, these statements represent Winfrey voicing her opinion that Plaintiff did not care for the OWLAG students as much as Winfrey herself did. "Statements which represent differences of opinion or are annoying or embarrassing, are, without more, not libelous." Bogash, 176 A.2d at 679; see Beverly Enters., Inc. v. Trump, 182 F.3d 183. 187 (3d Cir. 1999) (finding that mere insults, even if distasteful and offensive, are not protected under Pennsylvania defamation law).  These are merely statements of Winfrey's opinion, and do not imply the existence of undisclosed facts. While this statement may be personally hurtful to Plaintiff, it cannot qualify as being capable of defamatory meaning under Pennsylvania law.

Therefore, the Court will grant Defendants' partial motion for summary judgment with respect to this statement.

### b.   November Press Conference

#### (1) Actionable Statements

(1)  *These 15 girls banded together and they acted because they felt that previously their voices had not been heard by other adults on campus.*

First, the Court finds that this statement is capable of defamatory meaning on the basis of innuendo.  The statement that the students' voices "had not been heard," standing alone, does not convey a defamatory meaning.  Viewed in context, however, the statement relates to the complaints of the OWLAG

students regarding abuse and the unwillingness of certain
individuals to "hear" those complaints.  In other words, this
statement charges that certain adults at OWLAG were not receptive
to the students' claims of mistreatment.  An accusation that a
school employee was either careless or dismissive of allegations
of abusive conduct indict that employee's competence in his or
her educational profession.  Therefore, the Court concludes that
this statement is capable of defamatory meaning.

    Second, the Court will address whether this statement
would be understood by the average listener to refer to Plaintiff
as required by § 8343(a)(3).  Plaintiff asserts that this
statement should be construed as "of and concerning" her because
she was one of a select group of adults that OWLAG students would
have gone to "voice" their concerns.

    Where defamatory statements are directed at a
reasonably identifiable group, a plaintiff may still demonstrate
such statements refer to her if she can demonstrate that she is a
constituent of such a group and would likely be identified as a
member of such a group by an average recipient.  See
Alvord-Polk, 37 F.3d at 1015.  Plaintiff testified that there
were approximately 30 "adults" on the OWLAG campus.  (Mzamane
Dep. 321:1-8.)  Under these facts, the Court concludes that there
is a readily identifiable group to which Winfrey's statement
could be applied and that Plaintiff was a member of this select

- 72 -

group.  Therefore, as an average listener could reasonably
conclude that this statement is "of and concerning" Plaintiff,
the question of whether this statement would actually be
understood by an average listener to refer to Plaintiff must
proceed to the jury.

In light of these two conclusions, the Court finds that
summary judgment is not warranted with respect to this statement.

(2) *As I said to the girls – I said to the girls this
summer before I knew of anything like this going on on the campus
because they – they say that they were always told that when I
appeared on campus to put on happy faces and – and to never
complain to me.*

When viewed in context, the Court finds that this
statement is capable of defamatory meaning through innuendo.
This statement indicates that OWLAG students were told to "put on
a happy face" and "never complain," and such statements create an
implication that the students were instructed never to complain
about the treatment from the Dorm Parents.  Importantly,
Winfrey's statement indicates that because the students were not
permitted to complain, Winfrey was precluded from learning that
"anything like this" was occurring at OWLAG.  In other words, a
natural reading of Winfrey's statement is that she was prevented
from learning of the abusive treatment because the actions of the
adults at OWLAG who instructed the students not to complain.  As
with the statements discussed above, a charge that any adult,
including Plaintiff, suppressed the students' ability to speak

- 73 -

out about their mistreatment impugns an individual's professional
competence.  Therefore, this statement is capable of defamatory
meaning.

Next, the Court must address the requirement under §
8343(a)(3) that this statement apply to Plaintiff.  As with the
above statement, this statement is limited to a comparatively
small group whose members are reasonably identifiable, i.e.,
employees at OWLAG.  Therefore, the Court concludes that this
statement reasonably could be interpreted by the average listener
to refer to Plaintiff.

Based on the above, the Court will deny Defendants'
motion for summary judgment with respect to this statement.

(3) *Regarding the girl who most recently left the campus
[Mncwabe], I recently spoke with that girl's mother.  I had been
told when the child left that the child was being taken out of
the school by her mother because her mother wished to spend more
time with her and wanted to go shopping.  That's what I had been
told.  And it wasn't until I read the article in the paper and
came to know that the article was true that I – I had reason to
suspect that the child left for other reasons.*

Viewing these statements in context, the Court
concludes that they are capable of defamatory meaning.  A
critical fact in determining the import of these comments is
Winfrey's reference to the "article in the paper."  Although not
explicitly mentioned, the context of these statements indicates
that Winfrey was referring to the Sowetan Article explaining the
circumstances surrounding the departure of Mncwabe, and more
specifically Mncwabe's parents' complaints to Plaintiff about the

mistreatment by the Dorm Parents.  Winfrey states that the recitation of these events contained in the Sowetan Article are true and are inconsistent with the information that was given to her.

Reading these statements in context, they could be interpreted by the average listener to mean that Plaintiff was the person who told Winfrey that Mncwabe had left in order to "go shopping," but that Mncwabe actually left after complaining to Plaintiff about the abusive treatment by the Dorm Parents.  In essence, Winfrey's statement can reasonably be interpreted by the average listener to create an innuendo that Plaintiff was untruthful or withheld information about her interaction with Mncwabe and Mncwabe's parents with respect to the allegations of abuse.  As this statement potentially implies that Plaintiff was dishonest in executing the duties of her profession, it is capable of defamatory meaning and survives summary judgment.  See Agency Services, 513 F. Supp. At 587-88 (letter imputing dishonesty in plaintiff's withholding funds which were obliged to be turned over found to be capable of defamatory meaning).

The issue of whether this statement is "of and concerning" Plaintiff presents a closer question.  Defendants emphasize that this statement does not identify Plaintiff in any respect, and therefore she has failed to meet her burden under  § 8343(a)(3).  Again, the critical fact to this inquiry is

Winfrey's reference to the "article" which she read indicating that Mncwabe left the school for reasons other than those told to Winfrey.  The Sowetan Article clearly states that Mncwabe's mother spoke with "the principal" about Mncwabe's claims of mistreatment, which reasonably serves to identify Plaintiff based on her position as Headmistress.  Furthermore, as discussed in detail below, Winfrey made statements indicating that she discussed Mncwabe's situation with her parents and that Mncwabe's parents told Winfrey that they complained to Plaintiff directly. Under the circumstances, the Court finds that an average listener could reasonably conclude that this statement is "of and concerning" Plaintiff.

Therefore, Defendants' motion for summary judgment is denied with respect to this statement.

(4) *[In response to a question as to whether Mncwabe would be able to return to OWLAG.]*
*As a matter of fact, I have not spoken to - as I said earlier, I have not spoken to her father, but I have spoken to her mother extensively who told me that she had on three occasions been to the school and had a conversation with the head of school complaining about the dorm parents.  I said to her, as I say to you, that was never relayed to me.  I was told something completely different.  I was told that she was a mother who missed her child and wanted to go shopping which didn't make any sense to me.*

First, the Court finds that these statements are capable of defamatory meaning.  As with the preceding passage, these statements create an innuendo that Plaintiff was untruthful with Winfrey concerning the impetus for Mncwabe leaving the

school and Plaintiff's awareness of Mncwabe's complaints about her mistreatment.  The import of Winfrey's statement that "I was told something completely different" concerning the conversations between Plaintiff and Mncwabe's parents is that Plaintiff was untruthful about the substance of these conversations.

A characterization of Plaintiff as deceitful in performance of her job duties with respect to dealing with complaints of students and conversations with parents about such complaints is capable of defamatory meaning.  See Smith v. Wagner, 588 A.2d 1308, 1311 (Pa. Super. Ct. 1991) (finding that depicting plaintiff as a liar is capable of defamatory meaning under Pennsylvania law); Dougherty, 547 A.2d at 783 (statements were capable of defamatory meaning where they disparaged the plaintiff's professional competence as a chiropractor and insinuated that he had defrauded his patients and a health insurer); Rockwell, 19 F. Supp. 2d at 405-06 (finding that accusations implying immoral and dishonest behavior with respect to plaintiff's work performance were capable of defamatory meaning).  Cf. Herbst v. Gen. Accident Ins. Co., No. 97-8085, 1999 WL 820194, at *12 (E.D. Pa. Sept. 30, 1999) ("Negative statements made in the context of employment-related evaluations with reference to particular incidents or occurrences which do not accuse the subject of dishonesty or something similar are not defamatory.") (emphasis added) (citing Wendler v. DePaul, 499

A.2d 1101 (Pa. Super. Ct. 1985)).  Therefore, the Court concludes
that this statement is capable of defamatory meaning.

Second, the Court concludes that sufficient evidence
exists as to whether this statement is "of and concerning"
Plaintiff to survive summary judgment.  It is true that Winfrey
does not identify expressly who relayed the untruthful
information to her concerning the conversations between Plaintiff
and Mncwabe's parents.  However, given the fact that Plaintiff
was the person at OWLAG who had the conversations with Mncwabe's
parents, and logically the person who would relay that
information to Winfrey, these statements can reasonably be
interpreted as referring to Plaintiff.

Based on the above analysis, the Court will deny
summary judgment with respect to these statements.

(5)  *[A]lthough they had apparently been living in an
atmosphere that repressed their voices, that this was a chance
for them to break the silence and take their voices back.*

First, the Court finds that this statement is capable
of defamatory meaning by innuendo.  As with several of the
statements previously discussed, Winfrey's characterization of an
"atmosphere that repressed their voices" creates an implication
that the students were silenced arbitrarily with respect to their
complaints.  If an educator, such as Plaintiff, were charged with
such conduct it would constitute an attack on the individual's
fitness for her profession, which undoubtedly is recognized as

capable of defamatory meaning under Pennsylvania law.

The Court rejects Defendants' argument that this statement represents only an expression of Winfrey's opinion through rhetorical hyperbole.  In the context in which this statement was made, the concept that the students "voices" were "repressed" and "silenced" implies the existence of specific undisclosed facts concerning the refusal of adults as OWLAG to heed the students' complaints.

Second, the Court finds that this statement could be reasonably interpreted to refer to Plaintiff for purposes of satisfying her burden under § 8343(a)(3) at the summary judgment stage.  As with several of the statements discussed above, this statement concerns a select group of adults on the OWLAG campus who had the ability to "repress" or "silence" the students' "voices."  As Plaintiff is a member of this readily identifiable group, an average listener could conclude the statement is "of and concerning" her.

Therefore, the Court will deny summary judgment with respect to this statement.

(6) *[In response to the question: "Do you feel that as a school you failed the girls?"]*
*No, I don't think that as a school we failed the girls because there's still many people at the school who are caring and dedicated and want the best for all the girls.  I think that there are systems within the school that fail the girls.  I feel that the girls were placed in an atmosphere where they were taught to be fearful and they were taught literally to be silenced.  And so when you remove the systems and put in a different kind of leadership, all of that will change.*

*I have nothing but real strong hope for the
possibilities of what this school can be.  No one is ever happy
to have this type of scandal or crisis.  I certainly am not.  But
I am glad that it happened now, and not two years from now
because this gives us an opportunity to completely course
correct, removing all the dorm parents.  As I've said to the
girls, cleaning house from top to bottom.*

With respect to the defamatory meaning of these
statements, Plaintiff contends that they indicate that she bore
responsibility for creating an atmosphere of fear and silence
with respect to the mistreatment of OWLAG students.  Plaintiff
relies on the following three allegations contained in these
statements, which if read in conjunction, support her position:
(1) that there are still people at OWLAG who are "caring and
dedicated," which indicates that Plaintiff did not possess those
traits as she was no longer at the school; (2) that "systems
within the school failed the girls" by creating an atmosphere of
fear and silence and removing those systems and putting in a
"different kind of leadership" refers to Plaintiff's role as
Headmistress and her contributing to repressing the students'
complaints of abuse; and (3) that OWLAG is seeking to "course
correct" by removing all the Dorm Parents and "cleaning house
from top to bottom," which indicates that Plaintiff's removal
from the "top" was connected with the allegations of abuse.

Defendants cite to Livingston v. Murray, 612 A.2d 443
(Pa. Super. Ct. 1992), in arguing that Winfrey's statements that
the individuals remaining at OWLAG were "caring and dedicated" do

not impugn Plaintiff's reputation based on the fact she is no longer at OWLAG.  In Livingston, a fired college athletic director asserted a defamation claim based on a press release which referenced his firing in connection with enthusiastic and favorable comments relating to the hiring of the new athletic director, arguably implying that the previous athletic director lacked national respect and the necessary qualifications as athletic director.  Id. at 214.  The court rejected that these statements amounted to a claim for defamation by innuendo on the ground that the statements praising the new athletic director and the "national respect" which he had around the country was merely an opinion that was based on disclosed facts relating to the new athletic director's achievements and qualifications.  Id. at 214-15.

The Court finds that Livingston is not apposite on this issue because in Livingston the opinion concerning the prowess of the replacement employee was based on disclosed facts.  Here, in contrast, Winfrey cited to no facts supporting her opinion that the new employees were caring and dedicated.  In contrast, the opinion proffered by Winfrey that the individuals who remained at OWLAG were qualified to care for the girls could be understood by an average listener to infer the existence of undisclosed derogatory facts about Plaintiff' lack of such qualities.  Here, unlike in Livingston, the speaker was privy to undisclosed

information concerning an internal investigation into abusive
conduct.  Thus, an average listener could interpret this
statement as implying undisclosed facts that reflect poorly on
Plaintiff's fitness for her profession as an educator.

Furthermore, Winfrey's statement that once "you remove
the systems and put in a different kind of leadership, all that
will change" is capable of defamatory meaning through innuendo.
Although Winfrey's reference the "systems" as failing the
students, she states that the students were placed in an
"atmosphere where they were taught to be fearful and they were
taught literally to be silenced."  Under these circumstances,
these statements can be understood to insinuate that certain
OWLAG employees, such as Plaintiff, were responsible for
repressing the students' complaints of abuse.  Such a charge is
clearly capable of defamatory meaning.

Finally, Winfrey's statement concerning OWLAG's
"cleaning house from top to bottom" in order to "course correct"
as a result of "this type of scandal or crisis" clearly
implicates that those employees removed from OWLAG contributed to
the abusive treatment of the students.  Such an accusation, if
deemed applicable to Plaintiff, is undoubtedly capable of
defamatory meaning.

The issue of whether these statements are "of and
concerning" Plaintiff presents a closer question.  Plaintiff

argues that Winfrey's statement that there were "still many
people at the school" who were caring creates the negative
implication that she was referring to OWLAG employees relieved
from duty as uncaring, which group included Plaintiff.
Furthermore, Plaintiff argues that Winfrey's statement that a
"different kind of leadership" refers to her because she would be
deemed a member of the old "leadership" by an average listener.
Finally, Plaintiff contends that the phrase "cleaning house from
top to bottom" refers to Plaintiff based on her status as an
employee who was discharged from OWLAG.

　　　　As with several of the statements addressed above, the
subject of these statements concern two specific groups: (1)
employees no longer at OWLAG, and (2) discharged employees who
qualify as the outgoing "leadership" of the school.  Plaintiff
qualifies as a member of each of these readily definable groups
and could be identified as such by an average listener.  First,
Winfrey clearly states during the November Press Conference that
Plaintiff would not be returning to OWLAG.  Second, Plaintiff's
position as Headmistress dictates that an average listener would
associate her with the "leadership" of the school.  It is
arguable that Winfrey's use of the phrase "cleaning house from
top to bottom" could be interpreted as applying only to Dorm
Parents, due to her explicit reference "removing all the dorm
parents" in the prior sentence.  The Court concludes, however,

that based on the preceding references by Winfrey in this passage

to a change in "leadership" an average recipient of the phrase

"cleaning house from top to bottom" could reasonably conclude

that Winfrey was referring to discharged OWLAG employees other

than just the Dorm Parents.  Therefore, the Court finds that

these statements can reasonably be interpreted as "of and

concerning" Plaintiff.

Based on the above, the Court will deny summary

judgment with respect to these statements.

### (2) Non-actionable statements

(7) *[A]nd as soon as I finished my conversation with the
girls and told the girls this is about taking your voices back
and things are gonna be different and I explained to the girls
that all the dorm parents had been removed and they cheered and
wept at that announcement.*

As this statement does not refer to Plaintiff as

required by § 8343(a), the Court need not address the question of

whether it is capable of defamatory meaning.  The fair and

natural reading of this statement is limited to commentary on the

Dorm Parents and their removal from OWLAG.  Absent some modicum

of evidence indicating that this statement refers to Plaintiff,

she has not satisfied her burden as to this statement under §

8343(a)(3).

(8) *[In response to the question: "How close a look have you
taken at the screening process [for Dorm Parents] and how is it
going to change in the future?"]*

*I think that knowing what I know now, the
screening process was inadequate.  Although I do know that for*

*every person that is hired at the school, there is both a civil and a criminal background check.  But I was not directly responsible or in charge, although the buck always stops with me, of hiring the dorm parents.  But we are going to redefine what that position should mean and what the qualifications for that position should be in the future.*

These statements are not actionable on two grounds. First, these comments are not capable of defamatory meaning as they merely indicate that the screening process used by OWLAG was insufficient.  The fact that the "screening process" was inadequate would not serve to "blacken" Plaintiff's reputation under the circumstances.  <u>See generally</u> <u>Gordon</u> 489 A.2d at 1369 (statements expressing lack of confidence in the plaintiff's professional abilities and recommending that his contract not be renewed were not defamatory); <u>Salerno v. Phila. Newspapers, Inc.</u>, 546 A.2d 1168, 1171-72 (Pa. Super. Ct. 1988) (finding that statements were not defamatory as a matter of law where there was no explicit or implicit suggestion that plaintiff was associated with the "mob," although he was mentioned in the same article as a victim of retaliation).  Second, nothing contained in these statements serves to identify Plaintiff as the intended target of Winfrey's criticism.  Even though Plaintiff was in fact responsible for the screening process, this fact as to the internal workings of OWLAG would not be known to the average listener.  Therefore, Plaintiff has not presented sufficient evidence to demonstrate that these statements apply to her.

(9) *[In response to the question: " Perhaps you can just fill us in on what the status of the headmistress — who is on suspension?"]*

*The first question, regarding the headmistress, - when I first heard of this, the headmistress was visiting the United States.  She and I were to be looking for the incoming candidates for this year's selection of seventh graders and I informed her that she would be put on leave of absence pending this investigation.  And since that time, we have informed her that we will not be renewing her contract.  Her contract was up this December 31st.*

With respect to whether these statements are capable of defamatory meaning, Plaintiff does not contest the veracity of these statements.  In fact, Plaintiff admitted in her deposition that she was placed on administrative leave on October 8, 2007, and that she was informed that her contract would not be renewed on October 18, 2007.  (See Mzamane Dep. 14:10-17.)   Rather, she contends that the innuendo created by these statements is that the decision not to renew Plaintiff's contract was a result of information uncovered during the internal investigation, thereby suggesting that she was involved to some degree in the abusive conduct at OWLAG.  Plaintiff's proposed construction exceeds the permissible boundaries of the theory of defamation by innuendo. Plaintiff adopts an "unfair and forced construction." Livingston, 612 A.2d at 449 (quoting Sarkees, 37 A.2d at 546). Simply put, Plaintiff attempts to extract a defamatory meaning from these admittedly true statements that does not otherwise exist.  Therefore, the Court concludes that these statements are not capable of defamatory meaning and will grant Defendants'

motion for summary judgment with respect to these statements.

In sum, the Court concludes that the communications (statements numbered (1) through (12) from the October Meeting and the statements numbered (1) through (6) from the November Press Conference) are capable of defamatory of meaning and could be interpreted as "of and concerning" Plaintiff to the degree necessary to withstand summary judgment.[24]  However, the Court

---

[24]    As noted above, in order for Plaintiff's defamation claims to survive summary judgment she must prove the requisite damages.  See 42 Pa. C.S. § 8343(a)(3), (6).  Where a plaintiff asserts a claim for defamation per se, "only general damages, i.e., proof that one's reputation was actually affected by defamation or that one suffered personal humiliation, or both, must be proven; special damages, i.e., out-of-pocket expenses borne by the plaintiff due to the defamation, need not be proven."  Joseph, 959 A.2d at 344 (citing Brinich v. Jencka, 757 A.2d 388, 397 (Pa. Super. Ct. 2000)).  Pennsylvania recognizes that a defamation claim involving an individual's trade or profession falls into this per se category.  See Walker v. Grand Cent. Sanitation, Inc., 634 A.2d 237, 241 (Pa. Super. Ct. 1993).

Plaintiff submits that despite her unblemished record of professional employment, she was unable to obtain a position in the educational field from the time of Winfrey's public comments until August 2008.  Furthermore, Plaintiff asserts that she suffered personal humiliation and distress as a result of being wrongly associated with the misconduct at OWLAG due to Winfrey's comments.  Plaintiff testified that she was "distraught" and that she received harassing phone calls from media seeking her response to the controversy occurring at OWLAG.  (Mzamane Dep. 91:3-92:13.)  Plaintiff further testified that subsequent to Winfrey's public statements, she was confronted by individuals concerning the "accusations" against her with respect to the controversy at OWLAG, and that these interactions were "painful" and "a constant source of injury to her."  (See id. 378:6-13, 380:7-16.)  Here, Plaintiff's testimony concerning damage to her reputation and the attendant emotional harm is sufficient to prove the required general damages.  See Marcone, 754 F.2d at 1080 (plaintiff's testimony that he was "frustrated, distraught, upset, and distressed" due to defamatory publication

finds that summary judgment is appropriate with respect to statement (13) from the October Meeting and the statements numbered (7) through (9) from the November Press Conference, as these statements are not actionable under Pennsylvania law. Therefore, the Court will grant Defendants' partial motion for summary judgment with respect to these statements.

Upon concluding that these statements are actionable under Pennsylvania law, the Court must now address whether Defendants are shielded from liability based on First Amendment protection.

### 3.   First Amendment Implications

Since the landmark decision in New York Times v. Sullivan, 376 U.S. 254 (1964), the Supreme Court has balanced the interest of states in protecting their citizens' reputations through defamation law with the First Amendment's protection of a free marketplace of ideas.  Through New York Times and its progeny, the Supreme Court has mandated that public figures are required to demonstrate "actual malice" on the part of the publisher by clear and convincing evidence in order to recover under state defamation law.  See New York Times, 376 U.S. at

---

was sufficient to prove actual damages under Pennsylvania law); Joseph, 959 A.2d at 345 (plaintiff's testimony concerning humiliation and emotional stress resulting from defamatory statements can satisfy the requirement of compensable damages); Wilson v. Benjamin, 481 A.2d 328, 333 (Pa. Super. Ct. 1984) (same).

279-80; <u>Curtis Publ'g Co. v. Butts</u>, 388 U.S. 130, 153-54 (1967).
Therefore, in order to determine whether the statements at issue
are constitutionally protected, the Court must determine whether
the Plaintiff qualifies as a public figure, and if so, whether
the statements were made with actual malice.  These issues are
addressed in turn.

   i.  Plaintiff's Status as a Public Figure

   In <u>New York Times v. Sullivan</u>, the Supreme Court for
the first time held that the First Amendment limits the reach of
state defamation laws.  376 U.S. at 271.  The <u>New York Times</u>
decision aimed to strike a balance between a state's interest in
protecting an individual's reputational interest through
defamation law and the "profound national commitment" to the
First Amendment principle "that debate on public issues should be
uninhibited, robust, and wide-open."  <u>Id.</u> at 270-71.  The Court
concluded that the constitutional guarantees of the First and
Fourteenth Amendments require "a federal rule that prohibits a
public official from recovering damages for a libelous
publication relating to his official conduct unless he proves
that the statement was made with 'actual malice.'"  <u>Id.</u> at
279-80.  <u>New York Times</u> recognizes that public figures whose
activities are susceptible to the public debate safeguarded by
the First Amendment are subject to a lessened form of protection
under state defamation law.

Subsequent to its decision in New York Times, the Supreme Court, in Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974), again reviewed a defamation case in light of First Amendment considerations.  Gertz addressed the necessity of constitutional safeguards in a defamation suit brought by a plaintiff who was not a public figure where the complained-of speech related to matters of public concern.  Balancing the interest of states in compensating private individuals for injury to personal reputation against First Amendment concerns, the Court held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher . . . of falsehood injurious to a private individual."  Id. at 347-48.

Importantly, Gertz categorized the types of public figures into three classes: (1) all purpose public figures, i.e., individuals who maintain a position of "such persuasive power and influence that they are deemed public figures for all purposes;"[25] (2) involuntary public figures, i.e., individuals who become public figures without any "purposeful action;" and (3) limited purpose public figures, i.e., individuals who are

---

[25]    All-purpose public figures can best be understood as individuals who have achieved such a level of renown to be considered household names.  See Schiavone Const. Co. v. Time, Inc., 847 F.2d 1069, 1077 (3d Cir. 1988).  Examples of such figures include President Barack Obama, golfer Tiger Woods, and, ironically, Oprah Winfrey.

deemed public figures only within the context of a particular
dispute as a result of voluntarily "thrust[ing] themselves to the
forefront of particular public controversies in order to
influence the resolution of the issues involved." Gertz, 418
U.S. at 345; see also U.S. Healthcare, Inc. v. Blue Cross of
Greater Phila., 898 F.2d 914, 938 (3d Cir. 1990) (explaining that
Gertz distinguished three types of defamation plaintiffs).

The question of whether a plaintiff is a public or
private figure is a question of law to be decided by the Court.
U.S. Healthcare, 898 F.2d 938 (citing Marcone, 754 F.2d at 1081
n.4.) Defendants concede that Plaintiff does not qualify as an
all purpose public figure or involuntary public figure, however,
they argue that as a result of her position, Plaintiff should be
classified as a limited purpose public figure.  The Court in
Gertz explained that "an individual [who] voluntarily injects
himself or is drawn into a particular public controversy . . .
thereby becomes a public figure for a limited range of issues."
418 U.S. at 351; see Bartnicki v. Vopper, 532 U.S. 514, 539
(2001) (internal citations omitted) (stating that limited public
figures "subject[] themselves to somewhat greater public scrutiny
and [have] a lesser interest in privacy than an individual
engaged in purely private affairs").  Therefore, the Court
proceeds to the issue of whether Plaintiff constitutes a limited
purpose public figure.

Under the guidance of <u>New York Times</u>, <u>Gertz</u> and their progeny, the Third Circuit has adopted a two-pronged inquiry in determining whether a plaintiff qualifies as a limited purpose public figure: (1) whether the alleged defamation involves a public controversy, and (2) the nature and extent of plaintiff's involvement in that controversy.  <u>McDowell</u>, 769 F.2d at 948 (citing <u>Marcone</u>, 754 F.2d at 1082).  This analysis should be informed by an understanding of the undergirding rationale for the differential treatment of public figures under the First Amendment.  <u>See</u> <u>U.S. Healthcare</u>, 898 F.2d at 938 (finding that the factors underlying the differing treatment of public figures inform the determination of whether an individual is a limited purpose public figure).  The Third Circuit summarized this justification as follows:

> First is the rationale of self-help. Public figures have greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy . . . . Second, and perhaps more important, is the notion of assumption of risk. Public officials and public figures in some sense voluntarily put themselves in a position of greater public scrutiny and thus assume the risk that disparaging remarks will be negligently made about them.

<u>McDowell</u>, 769 F.2d at 947-48 (internal quotation marks and citations omitted).  Succinctly stated, in order "to be a limited purpose public figure, the plaintiff must voluntarily thrust himself into the vortex of the dispute."  <u>Marcone</u>, 754 F.2d at 1083; <u>see</u> <u>Butts</u>, 388 U.S. at 155 (noting that a plaintiff may be

labeled as a public figure where "his purposeful activity amount[s] to a thrusting of his personality into the 'vortex' of an important public controversy); see, e.g., Steaks Unlimited, 623 F.2d at 273-74 (holding that a meat producer that aggressively advertises its product in the media becomes a limited purpose public figure for purposes of public comment on the quality of the product advertised).

The first question to be addressed under this limited public figure analysis is whether the scandal concerning the mistreatment of the students at OWLAG constitutes a public controversy.  Although the Third Circuit has not adopted an explicit definition of what constitutes a public controversy,[26] it has cited approvingly to the decision of the Court of Appeals of the District of Columbia in Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1296 (D.C. Cir. 1980).  There the court characterized a public controversy as a "real dispute, the outcome of which affects the general public or some segment of it."  See McDowell, 769 F.2d at 948 (quoting Waldbaum, 627 F.2d at 1296); see also Marcone, 754 F.2d at 1083 (adopting the definition of public controversy set forth in Waldbaum).  In other words, "[t]o be 'public,' the dispute must affect more than its immediate participants."  Marcone, 754 F.2d at 1083; see,

---

[26]    In fact, the Third Circuit has acknowledged that "[t]he proper dimensions of the public controversy requirement have proved difficult to diagram."  Marcone, 754 F.2d at 1083 n.7.

e.g., id. at 1086 (holding that a nationwide drug smuggling ring, the largest uncovered at the time, was a public controversy since drug trafficking "is one of the most troubling issues of our time"); McDowell, 769 F.2d at 948 ("This controversy, involving a possible conflict of interest of a government official, the awarding of government contracts, and the expenditure of hundreds of thousands of dollars is undeniably a matter of public concern."); Schiavone Const, 847 F.2d at 1078-79  (finding that confirmation hearings on Secretary of Labor with reputed underworld ties constitutes a public controversy).

        The Third Circuit's decision in Avins v. White, 627 F.2d 637 (3d Cir. 1980), is instructive in discerning whether this case presents a public controversy.  In Avins, the founder and former Dean of Delaware Law School brought a defamation action against the American Bar Association with respect to certain comments regarding the dean's behavior during the accreditation process.  Id. at 640-42.  The court found that Delaware Law School's struggle for accreditation constituted a legitimate public controversy on the grounds that its success or failure would affect members of the Delaware bar as well as current and potential students who resided both inside and outside of Delaware.  Id. at 948.  In reaching this conclusion, the Third Circuit also cited to meetings concerning the accreditation being held by interested parties and coverage of

the accreditation struggle by the local news media.  Id.  The
court concluded that the school's attempted accreditation
"affected the 'general public or some segment of it in an
appreciable way,'" and therefore constituted a public
controversy.  Id. (quoting Waldbaum 627 F.2d at 1296).

Here, the opening of OWLAG impacted the general public,
students, and their families.  The school's opening was met with
considerable media attention in the United States.  Although
likely due in large part to Winfrey's celebrity status, this
notoriety can be attributed, at least in part, to the novel
nature of the school itself.

The Court concludes that the relevant controversy in
this case is at least two fold.  One, whether this public-private
institution employing a novel and innovative approach to
providing a high-caliber education to girls from disadvantaged
backgrounds located throughout South Africa would succeed.[27]

_____

[27]     OWLAG's website summarized the mission statement of the
school as follows:

The Oprah Winfrey Leadership Academy for Girls - South
Africa supports the development of a new generation of
women leaders who, by virtue of their education and
leadership, will lead the charge to positively transform
themselves, their communities and the larger world around
them.

To accomplish this goal, the Academy provides a rigorous
and supportive educational environment for academically
talented girls who come from economically disadvantaged
backgrounds.

- 95 -

Two, whether the OWLAG administration failed to protect students from abusive treatment by the Dorm Parents.  The safety and well-being of seventh and eighth grade students in receiving a quality education without being subjected to mistreatment is a matter of legitimate public concern.

The responsibility of OWLAG's administration to provide quality education, including guarding against the abusive treatment of its students are issues that were ripe for public comment.  Whether school officials would succeed in their educational mission, including safeguarding against verbal, physical, and sexual abuse of seventh and eighth grade students is a topic that would concern the community and trigger public discussion, regardless of whether a celebrity such as Winfrey was involved with the school.  See Marcone, 754 F.2d at 1086 (holding that criminal activity involving narcotics trafficking is an issue of public concern).

Therefore, the Court concludes that the allegations of abusive treatment of OWLAG students, and the role of school

_____

The Academy strives to equip its learners with the intellectual and social skills necessary to assume positions of leadership in South African society and beyond.

http://oprahwinfreyleadershipacademy.o-philanthropy.org/site/PageServer?pagename=owla_mission.

officials, such as Plaintiff, if any, in the alleged abusive treatment qualifies as a legitimate public controversy.

Having determined that a public controversy existed, the Court must consider the extent of Plaintiff's voluntary involvement in the controversy.  In <u>McDowell</u>, the Third Circuit held that a government engineer who agreed to act as the architect of a school, which was the source of public attention due to its federal funding, was a limited purpose public figure with respect to statements concerning the architectural deficiencies of the school.  769 F.2d at 949-50.  Similarly here, Plaintiff's acceptance of the position of Headmistress, which entailed her overseeing the operations of OWLAG and the well-being of the students, dictates that her involvement in the relevant controversy, for purposes of public comment, was significant.

Plaintiff's argument that she had only a limited connection to the controversy involving the Dorm Parents' misconduct is at odds with the substance of her amended complaint and the underlying theory of her case.  In her amended complaint, Plaintiff asserts that she was responsible for communicating with Winfrey "about issues ranging from the general administration of the academy and academy events, to the minute details of individual students' achievements, struggles and needs, to the academy's ongoing discussions and interactions with the students'

parents." (Am. Compl. ¶ 24.) The fact that Plaintiff was charged with far-reaching job responsibilities, particularly the obligation to monitor the students' adjustment and achievements at OWLAG, placed her at the forefront of the controversy over whether OWLAG's administration failed to safeguard students from misconduct at the hands of certain Dorm Parents.

Furthermore, the very theory of Plaintiff's case is that because Plaintiff held a leadership position in the OWLAG administration, Winfrey's somewhat ambiguous comments about the scandal would be understood by the average listener to refer to Plaintiff. Thus, under Plaintiff's own theory of the case, Plaintiff played a "major role" in the instant controversy. See Avins, 27 F.2d at 648 (concluding with "no difficulty" that a law school dean injected himself into public controversy over accreditation where he was "actively involved in every facet of the accreditation struggle").

The Court's conclusion with respect to Plaintiff's limited public figure status is congruent with the dual principles, i.e., self-help through media access and voluntary assumption of risk, underlying the lesser protection from defamation afforded to public figures. See U.S. Healthcare, 898 F.2d at 938 ("Under traditional defamation analysis, the parties' considerable access to the media and their voluntary entry into a controversy are strong indicia that they are limited purpose

public figures.").

First, public figures generally have "greater access to channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals enjoy." Gertz, 418 U.S. at 344.  Plaintiff concedes that she issued the Press Release, which was subsequently reported on by several news outlets, including The Philadelphia Daily News, and that she gave an interview to a television station in Philadelphia regarding the OWLAG controversy. (Mzamane Dep. 121-125, 208-210.)  She argues incorrectly that her ability to wield media influence should be discounted because she resorted to the media only after her reputation was damaged. This contention disregards the rationale espoused in Gertz, that the ability to access the media favors lesser protection for public figures precisely because they can effectively respond to critical statements through the channels of media.[28]

---

[28]    It is true that the Supreme Court has recognized that access to media generally should qualify as "regular and continuing" in order to be considered "one of the accouterments of having become a public figure." Hutchinson v. Proxmire, 443 U.S. 111, 136 (1979).  The fact that Plaintiff did not have continuous contact with the media is not dispositive.  In Time, Inc. v. Firestone, 424 U.S. 448, 454 n.3 (1976), the Supreme Court noted that a distinguishing factor in evaluating a plaintiff's use of the media in determining whether public figure status is appropriate is whether the plaintiff intended to affect the outcome of the public controversy.  In this case, Plaintiff's contact with the media, through the Press Release and her television interview, was intended to influence public opinion to some degree with respect to her culpability concerning the allegations of abuse.

Second, and more importantly, the notion that Plaintiff voluntarily assumed the risk of attracting public attention militates in favor of classifying Plaintiff as a limited public figure in this case.  See Gertz, 418 U.S. at 345 (noting that certain individuals choose to participate in public enterprises, and a necessary consequence of that involvement is exposure to increased risk of injury from defamatory statements); Steaks Unlimited, 623 F.2d at 273 ("[P]ublic figures effectively have assumed the risk of potentially unfair criticism by entering into the public arena and engaging the public's attention.").[29]

In Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1280-81 (3d Cir. 1979), the Third Circuit found that Don Chuy, a professional football player with the Philadelphia Eagles, was a limited purpose pubic figure with respect to statements regarding the effect of his medical condition on his ability to play football, due to the inevitable publicity which accompanies such a position.  The Third Circuit expounded upon this decision as follows:

Professional  athletes,  at  least  as  to  their  playing

<hr/>

[29]  One early commentator artfully described this rationale as follows, "[b]y voluntarily abandoning anonymity in favor of the public spotlight and its attendant heat, public figures have knowingly exposed themselves to a predictable risk of being burned."  Joel D. Eaton, The American law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer, 61 Va. L. Rev. 1349, 1420 (1975).

careers, generally assume a position of public
prominence. Their contractual disputes, as well as their
athletic accomplishments, command the attention of sports
fans. Chuy, in particular, was a starting player for the
Eagles.  He had gained special prominence for being
involved in a major and well-publicized trade in which
his contract was assigned from the Los Angeles Rams to
the Eagles. His injury was sustained on the field and led
to discovery of a physical condition which forced his
retirement. With all this as background, Chuy's dispute
with the Eagles in the 1970 offseason concerning payment
of two years' salary was no mere private contractual
matter. Chuy had been thrust into public prominence long
before Dr. Nixon's statements appeared in the April, 1970
Bulletin and we have no difficulty in concluding as a
matter of law that he was a public figure.

Id. at 1280.

Here, Plaintiff assumed a high-level position at a
school that was envisioned as being unique and innovative with
respect to the educational system in South Africa, and which was
associated with an enormously high-profile celebrity figurehead.
Simply put, it is reasonable to conclude that Plaintiff, by
accepting the position of Headmistress and the natural public
attention accompanying this position, as in Chuy, thrusted
herself into the vortex of some public prominence.

Plaintiff maintains that she never intended to garner
public attention merely by accepting the position as
Headmistress, emphasizing that her duties did not include any
type of media relations.  This assertion, however, is of no
moment to the Court's calculus.  As the Third Circuit has noted,
"[w]hen an individual undertakes a course of conduct that invites
attention, even though such attention is neither sought nor

desired, he may be deemed a public figure." McDowell, 769 F.2d at 949 (internal citations omitted); see Marcone, 754 F.2d at 1083; see also Rosanova v. Playboy Enters., Inc., 580 F.2d 859, 861 (5th Cir. 1978) (rejecting plaintiff's argument that he was not a public figure merely because he did not seek such a status by his association with members of organized crime).

Finally, Plaintiff advances two primary arguments against her characterization as a limited purpose public figure: (1) her position as Headmistress of a private school would not have received public attention absent Winfrey's status as a well-known celebrity; and (2) any public attention Plaintiff received occurred only after Winfrey made her defamatory statements, such that Plaintiff essentially was transformed into a public figure as a direct result of the defamatory remarks. The Court concludes that neither of these arguments is persuasive.

First, Plaintiff cites to Time, Inc. v. Firestone, 424 U.S. 454 (1976), in support of her argument that Winfrey's association with OWLAG does not dictate that Plaintiff's position as Headmistress renders her a public figure. Plaintiff's reliance on Firestone is misplaced. In Firestone, the Supreme Court found that a wife involved in divorce proceedings was not a public figure merely because her husband was from a wealthy family and the divorce had become a "cause celebre" among the public. Id. at 453-54. The Court reasoned that a divorce

proceeding is not a public controversy and that the plaintiff in no sense thrust herself into the public's attention merely by participating in mandatory judicial proceedings.  <u>Id.</u>

Here, unlike in <u>Firestone</u>, Plaintiff's position at OWLAG and the allegations of abusive conduct toward the students were not a purely private matter, but rather one that raised issues of public concern.  While Plaintiff is correct that mere association with Winfrey through OWLAG would not lessen her protection against defamation with respect to her personal life in matters completely unrelated to OWLAG, here, the subject of the alleged defamation was tied directly to her position in an enterprise in which there was a public interest.

Plaintiff argues that the instant case would not have generated any media attention absent Winfrey's association. While it is undoubtedly true that the extent of the media coverage would have been less frantic in Winfrey's absence, this argument confuses the issue.  The public figure inquiry is not concerned with the intensity of the public attention garnered by an issue.  Instead, it focuses on whether the matter is one that is the subject of public comment and affects more than the immediate participants regardless of the degree of preeminence the issue generates.  In other words, even without Winfrey's involvement in this matter, the question of what the administration of the school knew at the time or if they failed

to protect children against abusive treatment by the Dorm Parents was ripe for public comment, regardless of Winfrey's involvement in the case.

Second, Plaintiff contends that she was thrust into the controversy only as a result of Winfrey's defamatory comments, and that an individual cannot be deemed a public figure solely as a result of the defamation itself.  This concept of "bootstrapping" was recited by the Supreme Court in Hutchinson v. Proxmire, 443 U.S. 111 (1979).  In Hutchinson, a research scientist sued a United States Senator for defamation arising out of the Senator giving what he called a "Golden Fleece" award to the federal agencies that had sponsored the plaintiff's research.[30]  Id. at 114.  The Court found that the plaintiff could not be considered a public figure because his notoriety and subsequent access to the media was a direct result of his being given the "Golden Fleece" award in the first instance.  Id. at 135-36; see also Wolston v. Reader's Digest Ass'n, 443 U.S. 157, 166 (1979) (finding that a plaintiff who chose to ignore a subpoena to testify at a grand jury proceeding involving the subject of Soviet espionage, knowing that his refusal could attract publicity, was not a public figure since he was "dragged unwillingly" and played a minor role in the public controversy

---

[30]     The award was designed and the recipient was selected by Senator William Proxmire of Wisconsin, and it sought to highlight wasteful government expenditures.  Id. at 113.

involving the investigation of Soviet espionage).

Plaintiff's argument is unavailing in that her attempt to frame the relevant controversy as developing only after Winfrey's comments at the October Meeting and November Press Conference is unsupported by the record.  The controversy at issue began at the earliest with the opening of the school but certainly not later than when the allegations of abuse first surfaced in the Sowetan Article, both of which were before Winfrey's public comments.  Therefore, Plaintiff's actions in accepting the position of Headmistress exposed her to public attention and commentary on such an issue before Winfrey's allegedly defamatory statements.  Under these circumstances, the risk of bootstrapping is not present here.  See Clyburn v. News World Commc'ns, Inc., 903 F.2d 29, 34 (D.C. Cir. 1990) (public controversy concerning the death of a woman with potential ties to then-D.C. Mayor Marion Barry caused the boyfriend of the deceased to be deemed a public figure because his actions in associating with certain high-profile government officials before the controversy put him at its center, explaining that "[o]ne may hobnob with high officials without becoming a public figure, but one who does so runs the risk that personal tragedies that for less well-connected people would pass unnoticed may place him at the heart of a public controversy").

Similarly, Plaintiff's reliance on the Fourth Circuit's

decision in <u>Foretich v. Capital Cities/ABC, Inc.</u>, 37 F.3d 1541 (4th Cir. 1994) is inapposite.  In <u>Foretich</u>, the plaintiffs were grandparents who had made public comments and appearances in response to accusations, which were covered by the media, that they sexually molested a grandchild.  <u>Id.</u> at 1557-58.  The court found that the plaintiffs utilization of the media to counteract these statements was necessary to prevent irreparable reputational damage.  In other words, by responding to false allegations these private figures were not metamorphosized into limited public figures.  <u>Id.</u>  <u>Foretich</u> is distinguishable in that it involved purely private figures who were not associated with a public enterprise and would have had no access to the media absent the defamatory allegations.  Here, by contrast, Plaintiff voluntarily held a significant position with a high-profile public institution before she sought to counteract the allegations made by Winfrey.  Therefore, even before she went public with her version of the facts, she was already a limited purpose public figure.

Based on the circumstances of this case, the Court concludes that Plaintiff qualifies as a limited purpose public figure with respect to statements involving the administration of OWLAG as it relates to the safety and treatment of the students. Plaintiff's status as Headmistress invited public comment about her performance in executing her responsibilities for overseeing

the development and well-being of the students, whether good or bad.  Having voluntarily joined a novel and innovative educational institution which was bound to attract public attention, in conjunction with a figure of worldwide renown, in a leadership position, the Court concludes that Plaintiff became a limited public figure under the First Amendment.

ii.  Actual Malice

Given Plaintiff's status as a limited purpose public figure, the burden shifts to Plaintiff to provide clear and convincing evidence of "actual malice."  St. Surin, 21 F.3d at 1318 (citing Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 n.30 (1984)).  The clear and convincing evidence standard applies even at the summary judgment stage of a defamation proceeding.  See Anderson, 477 U.S. at 255-56.

At its core, the question of actual malice entails a subjective inquiry into the defendant's belief as to the trustworthiness of the statements at issue.  See St. Amant v. Thompson, 390 U.S. 727, 732 (1968).  Therefore, although whether the evidence presented is sufficient to support a finding of actual malice is a question of law, Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 685 (1989) (internal citation omitted); "[t]he finder of fact must determine whether the publication was indeed made in good faith."  St. Amant, 390 U.S. at 732.  The critical point of the actual malice inquiry under

the First Amendment focuses on the defendant's attitude toward
the truth of the information itself, unlike the common law malice
inquiry which measures the defendant's attitude toward the
plaintiff as an individual.  See <u>Sprague v. Am. Bar Ass'n</u>, 276 F.
Supp. 2d 365, 377 n.17 (E.D. Pa. 2003) (explaining the
distinction between actual malice and common law malice "is the
object of defendants' recklessness; a defendant who acts with
common law malice acts with recklessness toward the plaintiff
himself, whereas one acting with actual malice acts with
recklessness toward the truth of the publication") (internal
citations omitted).

        The exact contours of the concept of actual malice have
never been drawn with precision.  However, certain boundaries are
fixed.  See <u>Schiavone</u>, 847 F.2d at 1090.  Actual malice cannot be
imputed merely based on an erroneous interpretation of the facts
underlying the defamatory statement.  See <u>Time v. Pape</u>, 401 U.S.
279, 290 (1971) ("Time's omission of the word 'alleged' amounted
to the adoption of one of a number of possible rational
interpretations of a document that bristled with ambiguities.
The deliberate choice of such an interpretation, though arguably
reflecting a misconception, was not enough to create a jury issue
of 'malice' under <u>New York Times</u>").  A finding of actual malice
is appropriate, however, where the defendant had "obvious reasons
to doubt the veracity of the informant or the accuracy of his

- 108 -

reports," St. Amant, 390 U.S. at 732 (footnote omitted); such as where the defendant is aware of internal inconsistencies or has access to apparently reliable information that contradicts the defamatory assertions. Schiavone Const., 847 F.2d at 1090 (internal citations omitted).

Furthermore, a party seeking to demonstrate actual malice need not rely solely on an admission from the mouth of the publisher. See Herbert v. Lando, 441 U.S. 153, 170 (1979) (noting that a plaintiff may "rarely be successful in proving awareness of falsehood from the mouth of the defendant himself"). Rather, a plaintiff may rely on objective circumstantial evidence in order to "override defendants' protestations of good faith and honest belief" as to the truth of the statements. Schiavone Const., 847 F.2d at 1090 (citing St. Amant, 390 U.S. at 732).

At the outset, the Court concludes that Winfrey's denials of "actual malice" in making the allegedly defamatory statements are not controlling. As explained above, the question of actual malice is a subjective inquiry as to the defendant's belief to be made by the finder of fact. As the Supreme Court has noted, a defendant cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." St. Amant, 390 U.S. at 732.

Actual malice exists where a statement was made with either: (1) knowledge of its falsity; or (2) reckless disregard

to its truth or falsity.  See New York Times, 376 U.S. at 279-80.
In order to show reckless disregard for the truth or falsity of a
statement, the plaintiff must put forth sufficient evidence to
support the conclusion that the defendant "entertained serious
doubts as to the truth of his publication," St. Amant, 390 U.S.
at 731; or "subjective awareness of probable falsity." McDowell,
769 F.2d at 915 (quoting Gertz, 418 U.S. at 335 n.6).

        Plaintiff has not argued, and therefore the Court need
not address, that actual malice can be demonstrated by Winfrey's
having knowledge of the falsity of the allegedly defamatory
comments made at the October Meeting and November Press
Conference.  Instead, the Court will focus on whether Plaintiff
has presented clear and convincing evidence demonstrating
Winfrey's reckless disregard as to the truth of the allegedly
defamatory statements.

        There are at least two methods available to aid
Plaintiff in showing reckless disregard for purposes of actual
malice.

        Under the first approach, a plaintiff presents evidence
that the defendant knows or has information which casts doubt as
to the truth of the allegedly defamatory communication.  The
second approach through which a plaintiff can establish reckless
disregard is by demonstrating that the publisher purposefully
avoided contradictory information due to the publisher's doubts

as to the truth of his own statements.  This theory is akin to the proverbial "burying one's own head in the sand" to avoid obtaining conflicting information.  With respect to this purposeful avoidance theory, however, courts have recognized that a failure to investigate the facts underlying an allegedly defamatory statement, standing alone, does not rise to the level of actual malice.  St. Amant, 390 U.S. at 733 ("Failure to investigate does not in *itself* establish bad faith.") (emphasis added); Marcone, 754 F.2d at 1089.  Therefore, while failure to investigate is one thing, "the purposeful avoidance of the truth is in a different category," Harte-Hanks, 491 U.S. at 692, and may rise to the level of actual malice.

In applying this purposeful avoidance theory, the Supreme Court in Harte-Hanks, held that sufficient evidence of actual malice existed to support a jury verdict in a defamation action where, inter alia, a newspaper failed to interview a key witness or listen to audio tapes directly relevant to the events being reported on, and the circumstances suggested that these actions were taken based on a fear that this information might contradict the story that the newspaper intended to print.  See 491 U.S. at 682-83.  Similarly, in Curtis Publishing Co. v. Butts, 388 U.S. 130, 161 n.23  (1967), the Court found actual malice where a newspaper failed to interview a witness who had the same access to the facts as the newspaper's informant and/or

review film of the event being reported on.[31]  According to these
teachings, actual malice may be found where there is sufficient
evidence from which a reasonable jury could infer that the
publisher of the statement subjectively doubted the truth of the
underlying information.  See Fischbein, 237 F.3d at 286-87;
accord Dunn v. Air Line Pilots Ass'n, 193 F.3d 1185, 1207-08
(11th Cir. 1999) ("When there is no pressing need for immediate
publication of a defamatory allegation, actual malice may be
inferred if the investigation given to the allegation is grossly
inadequate under the circumstances.") (internal citations
omitted); Vandenburg v. Newsweek, Inc., 441 F.2d 378, 380 (5th
Cir. 1971) (recognizing that "actual malice may be inferred when
the investigation for a story which is not 'hot news' was grossly
inadequate") (citing Butts, 388 U.S. at 156-158); Lohrenz v.
Donnelly, 223 F. Supp. 2d 25, 51 (D.D.C. 2002) ("There is no duty
for a defamation defendant to conduct further investigation,
unless the failure to conduct further investigation was so
glaringly deficient that the Court could infer that defendants
acted with 'reckless disregard.'") (internal citation omitted);
Medure v. New York Times Co., 60 F. Supp. 2d 477, 487 (W.D. Pa.
1999) ("[A] media defendant's purposeful avoidance of the truth

---

[31]    Although both Harte-Hanks and Butts concern media
defendants, this fact is not critical to the principle espoused
in these cases.  Thus, the proposition that purposeful avoidance
can constitute actual malice is not limited in scope to only
media defendants.

may be evidence of actual malice.") (internal citation omitted); Miles v. Nat'l Enquirer, Inc., 38 F. Supp. 2d 1226, 1229 n.1 (D. Colo. 1999) (recognizing that evidence of a grossly inadequate investigation is probative of actual malice in keeping with New York Times and its progeny).

Finally, under certain circumstances, the issue of whether a publisher's purposeful avoidance of information that contradicts the substance of an allegedly defamatory statement rises to the level of actual malice may be grounds to deny summary judgment.   In Suzuki Motor Corp. v. Consumers Union of U.S., Inc., 330 F.3d 1110, 1138-39 (9th Cir. 2003), the Ninth Circuit denied summary judgment where the publisher of a consumer safety report had knowledge that its safety tests were potentially biased.   The court reasoned that the publisher's forebearance from looking into its testing procedures, once they knew they may be deficient, could lead a jury to conclude that the publisher refused to conduct such an internal investigation because it was aware that doing so would disclose the falsity of its consumer product rating.   Id. at 1139.

With these principles in mind, turning to the case presently before the Court, a brief recitation of several key dates and events is helpful in placing in context the question of actual malice.

**October 6, 2007**

- 113 -

Winfrey receives a phone call from Samuel (Chief Executive Officer of OWLAG) alerting her to the fact that 15 OWLAG students complained to Samuel about mistreatment by the Dorm Parents.  Samuel informs Winfrey that he suspects that there was "sexual impropriety" between the students and the Dorm Parents.  (Winfrey Dep. 104:8-17.)

### October 8, 2007

Plaintiff meets with Winfrey in Chicago and is informed that she is being placed on administrative leave.  Plaintiff contends that she was not afforded an opportunity to discuss any issues with respect to OWLAG during this meeting.  (Mzamane Dep. 57:17-22, 58:21-22, 344:8-17.)  Winfrey disputes that Plaintiff was not presented an "opportunity to talk" at the October 8th meeting.  (Winfrey Dep. 259:1-6.)

### October 17, 2007

OWLAG releases a press statement stating that an internal investigation is being conducted into allegations of misconduct toward the students but that Plaintiff is not the subject of the allegations.  (Defs.' Mot. Summ. J. Ex. C-15.)

### October 18, 2007

Plaintiff and Winfrey speak on the phone.  Winfrey's position is that she discussed Plaintiff's understanding of the events at OWLAG during the October 18th phone call, however, Plaintiff disputes that any substantive discussions concerning

the events at OWLAG occurred.   Both Plaintiff and Winfrey concur

that this phone call represented the last communication between

them prior to Winfrey's allegedly defamatory statements.

### October 20, 2007

Winfrey organizes a meeting with the parents of the

students at OWLAG in order to discuss the allegations of abuse.

### November 5, 2007[32]

---

[32]   On October 22, 2007, in anticipation of scheduling the
November Press Conference, Winfrey sent an e-mail to certain
employees of Harpo and OWLAG, which stated:

> Hindsight is 20/20 but it is clear to me now that WE
> [sic] should have had a press conference after meeting
> with the parents and avoided all of these inaccuracies .
> . . and "spinned" the story with the truth.
> We all knew it was going to get out and were warned and
> advised by Isaac from governance board to "tell your own
> story."

(Winfrey Dep. Ex. 35.)   Winfrey acknowledged that this e-mail
references a conversation that she had with an individual (Isaac)
from the Governance Board of OWLAG who suggested "going ahead
with the story and relating our version of what was happening
with the story rather than letting all of the South African
newspapers spin the story."   (Winfrey Dep. 253:1-13.)   Winfrey
acknowledged that she also felt it was necessary to have a press
conference immediately after the October Meeting in order to have
her "story" disseminated to the public.   (See id. 253:15-20.)
This evidence indicates that Winfrey was cognizant that her
presentation of the events at OWLAG represented a "story" which
would be shaped by the available information.   The fact that
Winfrey elected to schedule the November Press Conference and
present a "story" which, as discussed above, implicated
Plaintiff's involvement with the allegations of abuse without
first receiving input from Plaintiff creates a reasonable
inference that Winfrey intended to "spin" the story with her
version of the facts and avoid receiving contradictory
information from Plaintiff.   See Vandenburg, 441 F.2d at 380
(recognizing that "actual malice may be inferred when the
investigation for a story which is not 'hot news' was grossly

Winfrey holds a press conference with the media in which she discusses the allegations of abuse at OWLAG.

* * * * *

In light of this factual predicate, the Court will address each approach through which Plaintiff seeks to establish Winfrey's reckless disregard as to the truth or falsity of the allegedly defamatory communications.

First, according to Winfrey, at the time of the November Press Conference[33] she did not believe that "Plaintiff knew" or that Plaintiff "was responsible" for any of the child abuse alleged to have taken place at the school.[34]  Winfrey's

---

inadequate"); see generally Pep v. Newsweek, Inc., 553 F. Supp. 1000, 1003 (S.D.N.Y. 1983) (noting that the failure to investigate is relevant to the determination of actual malice where it tends to show that a publisher did not care whether a statement was truthful or not or did not want to discover facts that would contradict his information).

[33]  Although Winfrey's testimony is limited to her state of mind at the time of the November Press Conference, there is nothing in the record to suggest that Winfrey did not possess the same opinion with respect to Plaintiff's knowledge of the allegations of abuse throughout the entire relevant time period.

[34]  During her deposition Winfrey stated that "[a]t the time that I made this press conference, I could tell you that I did not believe that [Plaintiff] knew . . . . I did not believe that [Plaintiff] knew."  (Winfrey Dep. 172:16-20.)  Winfrey further stated that "[a]t the time of this press conference , the reason why I didn't use [Plaintiff's name] -- if I had believed that [Plaintiff] knew, I would have been using her name.  And if I had believed that [Plaintiff] knew, I would have not said 'adults.'  I would have said 'the head of the academy who was in charge of these girls.'  If I had believed that [Plaintiff] was responsible, I would, with the voice that I have, I would have used it and that's what I would have said."  (Id.)

statement is consistent with the press release issued by OWLAG on October 17, 2007, which stated that "[t]he Head of Academy [Plaintiff] is not the subject of the allegation of misconduct." (Defs.' Mot. Summ. J. Ex. C-15.)   Importantly, despite professing that she did not know that Plaintiff was implicated in any wrongdoing, the allegedly defamatory statements by Winfrey (statements (1) through (12) from the October Meeting and statements (1) through (6) from the November Press Conference as defined above), when viewed in the light most favorable to Plaintiff, are capable of creating exactly the opposite impression in the mind of the average listener.   Therefore, if the jury were to conclude that the complained-of statements were defamatory, it could also infer that making defamatory statements with the belief that the underlying facts were false constitutes actual malice.

Second, Plaintiff argues that she has presented clear and convincing evidence of actual malice, sufficient to survive summary judgment, based upon Winfrey's purposeful avoidance of information exonerating Plaintiff from any wrongdoing concerning the allegations of abuse.   Plaintiff points out that at no time after the allegations of abuse surfaced in the media, was she interviewed by Winfrey or anyone associated with OWLAG or the internal investigation team to determine what she knew of the allegations.   Plaintiff contends that the fact that she was not

allowed to "tell her side of the story" in order to exonerate herself of any wrongdoing before Winfrey "went public" with her comments demonstrates Winfrey's reckless disregard for the veracity of the allegedly defamatory statements.

The Supreme Court's decision in Harte-Hanks is instructive with respect to this issue.  The controversy in Harte-Hanks involved the publication of statements by a grand jury witness that a political candidate had attempted to bribe one of the grand jurors.  491 U.S. at 660.  During its investigation of the allegations of corruption, the newspaper which published the statements failed to make any effort to interview the "key witness" or review tape recordings of the conversations underlying the bribery charges.  Id. at 692.[35]

The Supreme Court reasoned that the fact that both the witness and the tape recordings were resources that were easily available and most likely to either corroborate or disprove the facts underlying the story, and defendant neglected to utilize either source, created a reasonable inference that these omissions were motivated by a desire to avoid contradictory information.  See id. at 682-83.  Under these circumstances, the

_____

[35]    This is different from the duty to investigate.  In one, the defendant could have found the information by seeking it out through an investigation.  By contrast, purposeful avoidance is when the information is readily available and yet discarded in order to avoid learning facts which may undermine the speaker's subjective beliefs.

failure to check readily available sources revealed the
publisher's doubts as to the veracity of the information relied
upon.  See id.  The Supreme Court concluded that this evidence of
an intent to avoid the truth, when considered with the entirety
of the facts, was sufficient to support a jury finding of actual
malice based on clear and convincing evidence.  See id. at 692-
93.

        As in Harte-Hanks, according to Plaintiff's version of
the facts, Plaintiff was never interviewed or given an
opportunity to speak with Winfrey or any individual associated
with OWLAG or Winfrey's internal investigation team concerning
the events which transpired at OWLAG in order to avoid receiving
contradictory information.[36]  Plaintiff argues that her position
as Headmistress rendered her a critical source of information
with respect to the pervasiveness of physical and sexual abuse by
the Dorm Parents at OWLAG, and more specifically her own role, if
any, in this abusive treatment.  Plaintiff contends that Winfrey
had a simple and effective means to hear facts from her which
potentially could have indisputably exonerated Plaintiff from any
wrongdoing with respect to the abuse allegations.  This is
particularly compelling since Plaintiff was sitting right across

---

[36]    By coincidence, on October 8, 2007, just as the
controversy at OWLAG began to surface, Plaintiff had a pre-
arranged meeting with Winfrey concerning OWLAG student admissions
for the following school year.

from Winfrey in Chicago at the time that the allegations of
impropriety surfaced.

Plaintiff contends that even a cursory interview with
her would have served to either corroborate or disprove to a
large extent any suspicion that she had knowledge or was involved
in the abusive treatment of the OWLAG students.  Instead Winfrey
elected to forego the option of questioning Plaintiff directly as
to her knowledge of the abusive conduct and published statements
which arguably created the impression that Plaintiff did in fact
have some level of involvement in the Dorm Parents misconduct.
Therefore, viewing the evidence in the light most favorable to
Plaintiff, she has produced facts of record, which if believed,
show by clear and convincing evidence that Winfrey entertained
serious doubts as to the truth of the statements made during the
October Meeting and the November Press Conference.

D.   <u>False Light Analysis</u>

"The tort of false light involves 'publicity that
unreasonably places the other in a false light before the
public.'" <u>Ciolli v. Iravani</u>, 651 F. Supp. 2d 356, 376 (E.D. Pa.
2009) (quoting <u>Rush v. Phila. Newspapers, Inc.</u>, 732 A.2d 648, 654
(Pa. Super. Ct. 1999)).  In order to establish a cause of action
for false light, it must be shown that: (1) the false light in
which the plaintiff was placed would be highly offensive to a
reasonable person; and (2) the defendant had knowledge or acted

in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed.  Lin v. Rohm and Haas Co., 293 F. Supp. 2d 505, 521-22 (E.D. Pa. 2003) (citing Curran v. Children's Serv. Ctr., 578 A.2d 8, 12 (Pa. Super. Ct. 1990) (quoting Restatement (Second) of Torts § 652E))).[37]  The false light in which the plaintiff is placed must "entail such a 'major misrepresentation of [the plaintiff's] character, history, activities or beliefs that serious offense may reasonably be expected to be taken.'"  Puchalski v. Sch. Dist. of Springfield, 161 F. Supp. 2d 395, 410 (E.D. Pa. 2001) (quoting Curran, 578 A.2d at 13); see, e.g., Fanelle v. LoJack Corp., 79 F. Supp. 2d 558, 563 (E.D. Pa. 2000) (finding that presentation of plaintiff as an arrestee in a car theft investigation would be highly offensive to a reasonable person).

As explained above, after drawing all reasonable inferences in Plaintiff's favor, the statements made by Winfrey during the October Meeting and the November Press Conference could be interpreted to convey that Plaintiff had some knowledge

---

[37]     Although a claim for false light invasion of privacy under Pennsylvania law generally involves the public disclosure of private facts concerning the plaintiff, courts applying Pennsylvania law have found that "[i]t is enough [for the plaintiff] that the defendant has given publicity to any matter concerning the plaintiff that creates a 'highly offensive' false impression about the plaintiff."  Fogel v. Forbes, Inc., 500 F. Supp. 1081, 1087-88 (E.D.Pa. 1980); see, e.g., Tanzosh v. InPhoto Surveillance, Kroll, Inc., No. 05-1084, 2008 WL 4415693, at *6 (M.D. Pa. Sept. 26, 2008); McGee v. Times Leader, No. 90-1098, 1990 WL 288628, at *2 (M.D. Pa. Sept. 14, 1990).

and/or involvement in the abusive treatment of the OWLAG
students.  In her position as an educational professional, any
implication that Plaintiff would condone physical and/or sexual
abuse of students under her supervision could be deemed highly
offensive, therefore Defendants are not entitled to judgment as a
matter of law on this issue.  See <u>Harris by Harris v. Easton
Publ'g Co.</u>, 483 A.2d 1377, 1387 (Pa. Super. Ct. 1984) (whether
publication of welfare applicant's history is highly offensive is
a question of fact precluding summary judgment); <u>Martin v. Mun.
Publ'ns</u>, 510 F. Supp. 255, 259 (E.D. Pa. 1981) (denying summary
judgment and finding that whether a portrayal of an individual as
a "transvestite" and a "drunk" would be highly offensive to a
reasonable person under Pennsylvania law is a question to be
presented to the jury).

     As with her defamation claims, Plaintiff must
demonstrate that actual malice exists in order to succeed on her
false light claim.  With respect to actual malice, Plaintiff
relies upon the identical substantive allegations in support of
her claim for false light as her defamation claims.  As discussed
above, because Plaintiff has produced sufficient evidence, which
if believed, satisfies the clear and convincing standard for
demonstrating Winfrey's reckless disregard for the truth, summary
judgment is not appropriate on Plaintiff's claim for false light

invasion of privacy.[38]

    E.    Intentional Infliction of Emotional Distress Analysis

        The Pennsylvania Supreme Court has neither accepted nor
rejected the tort of intentional infliction of emotional distress
("IIED") as part of Pennsylvania law.  See Lin, 293 F. Supp. 2d
at 522 (noting that the Pennsylvania Supreme Court has never
addressed the question of whether this tort is cognizable under
Pennsylvania law).  The Pennsylvania Superior Court has held,
however, that a claim for IIED exists where the alleged conduct
is "so outrageous in character, and so extreme in degree, as to

_____

        [38]    Defendants argue that the concept of "publicity" is
missing with respect to the statements made during the October
Meeting as this was a "closed" meeting limited to the parents of
OWLAG students and the statements made were not otherwise
publicly disseminated.  Comment a to section 652D of the
Restatement (Second) of Torts, defines publicity as making the
matter "public, by communicating it to the public at large, or to
so many persons that the matter must be regarded as substantially
certain to become one of public knowledge . . . . It is [a
matter] of a communication that reaches, or is sure to reach, the
public."  Restatement (Second) of Torts § 652D cmt. a (1977).
The element of publicity has been established where facts were
disclosed to as few as seventeen individuals.  See Harris, 483
A.2d at 1385-86 (holding that "communication to a group of
seventeen individuals is large enough to constitute publicity as
a matter of law").  Here, Defendants did not disclose the exact
number of parents who attended the October Meeting in support of
their argument that the publicity element was not met.
Furthermore, although Defendants attempted to maintain
confidentiality with respect to Winfrey's statements during the
October Meeting, the parents who attended the meeting were not
prohibited from disseminating the allegedly damaging information
concerning Plaintiff outside of the October Meeting.  Under the
circumstances, the Court cannot conclude that Defendants are
entitled to judgment as a matter of law with respect to the
element of publicity.

go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (quoting <u>Hunger v. Grand Cent. Sanitation</u>, 670 A.2d 173, 177 (1996)).  In order to make out an IIED claim the "recitation of the facts to an average member of the community [should] arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Id. (quoting <u>Hunger</u>, 447 670 A.2d at 177).

Although the Pennsylvania Supreme Court has not established that a showing of physical injury is necessary to make out an IIED claim, (or even that a tort for IIED exists in Pennsylvania), state and federal courts within the Third Circuit recognize that physical injury is a prerequisite for such a claim.  <u>See, e.g.</u>, <u>Di Loreto v. Costigan</u>, 600 F. Supp. 2d 671, 690 (E.D. Pa. 2009) (Buckwalter, J.) ("Pennsylvania law requires some type of physical harm due to the defendant's outrageous conduct to satisfy the severe emotional distress element."); <u>Robinson v. May Dep't Stores Co.</u>, 246 F. Supp. 2d 440, 444 (E.D. Pa. 2003) (Brody, J.) (stating that Pennsylvania law requires plaintiff to establish "physical injury or harm" for an IIED claim); <u>Dixon v. Boscov's, Inc.</u>, No. 02-1222, 2002 WL 1740583, at *3 (E.D. Pa. July 17, 2002) (Reed, J.) (holding that complaint that failed to allege any physical injury did not state a claim for IIED under Pennsylvania law); <u>Reeves v. Middletown Athletic Ass'n</u>, 866 A.2d 1115, 1122-23 (Pa. Super. Ct. 2004) ("plaintiff

must suffer some type of resulting physical harm due to the
defendant's outrageous conduct"); <u>Fewell v. Besner</u>, 664 A.2d 577,
581-82 (Pa. Super. Ct. 1995) (citing <u>Kazatsky v. King David Mem'l
Park</u>, 527 A.2d 988, 995 (Pa. 1987)).

        Here, Plaintiff does not allege any type of physical
injury associated with Defendants' conduct.  In light of the
precedent set forth above, the Court concludes that summary
judgment is appropriate in favor of Defendants on Plaintiff's
IIED claim.


IV.  CONCLUSION

        For these reasons, the Court concludes that a conflict
of laws analysis requires application of Pennsylvania law to
Plaintiff's claims.  Furthermore, the Court concludes that
certain statements from the October Meeting and the November
Press Conference, identified above, are capable of defamatory
meaning and "of and concerning" Plaintiff under Pennsylvania law.
The Court further finds that Plaintiff qualifies as a limited
public figure under the First Amendment, but that, if believed by
the jury, Plaintiff has pointed to sufficient evidence of record
demonstrating that Winfrey acted with actual malice to satisfy
the clear and convincing evidence standard.  Finally, the Court
concludes that Plaintiff has presented insufficient evidence of
physical injury resulting from Defendants' conduct in support of

her claim for intentional infliction of emotional distress.

          In light of these conclusions, Defendants' motion for summary judgment will be granted in part and denied in part with respect to the defamation claims in accordance with this Memorandum.   Furthermore, Defendants' motion with respect to Plaintiff's false light claim will be denied.   Finally, Defendants' motion for summary judgment with respect to Plaintiff's claim for intentional infliction of emotional distress will be granted.   An appropriate order will issue.